[Crim. No. 5600.   In Bank.   Oct. 26, 1954.]

THE PEOPLE, Respondent, v. RICHARD JOHN JENSEN, Appellant.

F. Walton Brown and Harold J. Ackerman, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

EDMONDS, J.—A jury found Richard John Jensen guilty on each count of an information charging him with robbery, assault with intent to commit murder, and kidnaping for the purpose of robbery. The court ordered that the sentences for the first two offenses run concurrently and for the last offense, following the recommendation of the jury, fixed the penalty at death. The statutory appeal (Pen. Code, § 1239, subd. b) is from the judgment and from an order denying a motion for a new trial.

While driving along a main highway Jensen stopped and offered a ride to Marion L. Piper, a sergeant in the United

States Marine Corps, who was "hitchhiking." Piper accepted, and they drove several miles to the intersection of the highway with a side road. Jensen announced that he wanted to "stop off and see a buddy for a few minutes" and turned on to a side road. After proceeding for 3 or 4 miles he stopped the car. In the rear seat, hidden under a blanket, was a device which Jensen had constructed from the barrel and mechanism of a .22 caliber rifle. The barrel was mounted so that the muzzle pointed through a hole which had been drilled in the metal back of the front seat, directly behind the place where a passenger would be seated. As Jensen turned to open the door he pulled a wire which caused the gun to fire.

The bullet lodged in the lower left side of Piper's back. Seizing a hammer from the rear seat, Jensen walked around the car to Piper, who had alighted and was standing beside the car, and struck him on the head with it several times. Dazed, Piper fell forward. His wallet was removed, and when he stirred and spoke in protest, he received another blow on the head. Jensen pushed him into the car and started to drive away, but, when the injured man slumped across the gear shift lever, he stopped, dragged him into the rear seat, and covered him with a blanket.

A few minutes later, the car stopped. Piper feigned unconsciousness as Jensen, carrying a small camping light, slashed his shoe laces with a knife. When Jensen attempted to remove the second shoe Piper kicked at him, knocking him off balance and causing him to drop the light. Jensen ran around the car and fired a shot from a shotgun which struck the marine in the left side of the chest. Piper then dropped to the ground.

Jensen returned to the sergeant, who lay semiconscious on his back, and turned him over on his face. He removed Piper's clothing from the waist down and twice attempted to commit an act of sodomy. Afterwards, he completely disrobed the marine, and tore off his "dog tags" and wristwatch, in the process inflicting severe gashes in the flesh of his hand. Piper was dragged to the edge of the road where Jensen, after feeling his pulse, struck him on the head again with the hammer and then rolled him 4 or 5 feet down an embankment. He covered Piper with dirt and drove away.

Piper lay quietly until Jensen had gone and then crawled up the embankment to the road. He walked about a mile before he found help. In a critical condition, he was removed to a hospital where he underwent extensive surgery. Piper

testified at the trial although still hospitalized from injuries which were described as permanent.

Jensen was apprehended close to the point where the side road rejoins the main highway within a short time after he left Piper. On his person police officers found Piper's wallet, wristwatch, "dog tags" and several one-dollar bills which Jensen admitted belonged to Piper. On his clothing were spots which chemical analysis showed to be blood of the same type as that of the marine. Blood stains also appeared on the upholstery of Jensen's automobile and on various implements in it. In the car were found several knives, a shotgun, parts of a .22 caliber rifle and another gun. The shotgun and rifle had been fired a short time before their discovery. Ballistics tests established that the bullet lodged in Piper's back came from the rifle, and hammer markings on an empty shell casing found near the scene of the attack corresponded with those made by the shotgun.

When arrested, Jensen gave conflicting accounts of what had happened. At first he denied attacking Piper, but later made several detailed confessions. He stated that he had planned to rob a hitchhiker and decided upon a serviceman as presenting the best opportunity for obtaining money. He devised the apparatus in the rear seat on the morning of the attack, he said, and after testing it to his satisfaction he mounted it in the car as "a sort of secondary defense, in case the person [he] was holding up attempted to fight back." His meeting with Piper was described, and he admitted attacking him although he denied molesting him sexually. According to Jensen, he removed the sergeant's clothing to delay as long as possible identification of the body. To police officers he related the circumstances of the attacks and his later attempts to obliterate signs of them. He pointed out the locations where the attacks occurred and the places he discarded items of incriminating evidence and buried Piper's clothing. In explanation of his actions, he said "my original intent was simply robbery. I kind of lost my head, went further than I originally planned on."

Before the trial, counsel for Jensen moved under section 995 of the Penal Code to set the information aside. The motion was denied and pleas of not guilty and not guilty by reason of insanity were entered. By order of the court, Jensen was examined by three psychiatrists, each of whom concluded that Jensen was sane at that time and also when the offenses were committed. At the close of the People's

case, Jensen, independently of his counsel, presented to the trial judge a written document containing "objections" and motions for a mistrial and for a change of venue. The motions were denied. At Jensen's request, his counsel then withdrew his plea of not guilty by reason of insanity. Jensen declined to take the stand, and the defense rested without presenting any evidence.

Two contentions are made by Jensen. He asserts that the trial judge erred in failing to order a trial upon the question of his present sanity. Another point is that the trial judge committed prejudicial error in permitting the district attorney to state to the jury the meaning of life imprisonment without possibility of parole.

Section 1368 of the Penal Code provides that "[i]f at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded. . . ." ■ A defendant is sane within the meaning of this section if he is able to understand the nature and purpose of the proceedings taken against him and to conduct his own defense in a rational manner. (*People* v. *Gomez,* 41 Cal.2d 150, 158 [258 P.2d 825]; *People* v. *Aparicio,* 38 Cal.2d 565, 567 [241 P.2d 221].) ■ "The 'doubt' mentioned is one that must arise in the mind of the trial judge, rather than in the mind of counsel for the defendant or in that of any third person . . . and the determination of a motion for a hearing upon the issue of a defendant's sanity at the time of trial is one which rests within the sound discretion of the court." (*People* v. *Lindley,* 26 Cal.2d 780, 789 [161 P.2d 227].) ■ And "it is only where, as a matter of law, a 'doubt' may be said to appear, or where there has been an abuse of the discretion that is vested in the trial judge, in the determination of the question, that the conclusion of the latter properly may be disturbed on appeal therefrom." (*People* v. *Perry,* 14 Cal.2d 387, 399 [94 P.2d 559, 124 A.L.R. 1123].)

According to the reports of the psychiatrists who examined Jensen, when the present offenses were committed he was on leave from a state hospital designated by section 6500 of the Welfare and Institutions Code for the care and treatment of "the insane, the mentally ill, and the mentally disordered." That fact, it is urged, established a presumption of insanity continuing until the time of trial and sufficient,

as a matter of law, to create a doubt as to his sanity at that time. This argument is by way of analogy to the discussion in *People* v. *Baker*, 42 Cal.2d 550 [268 P.2d 705]. Counsel for Jensen read the opinion in that case as holding that "the presumption of insanity arises out of a commitment when the question of criminal responsibility is to be determined." By a parity of reasoning, it is asserted, the same presumption should apply when the defendant's sanity at the time of trial is considered.

In the Baker case, it was contended that the evidence was insufficient to support the verdict that he was sane at the time the crime was committed. For a contrary conclusion the People relied, among other things, upon the rebuttable presumption of sanity. The court said: "Proof that defendant was afflicted with a permanent insanity, as distinguished from a temporary or transient insanity, prior to the commission of the crime charged will . . . dispel the presumption of sanity and raise a presumption that his insanity continued to exist until the time of the commission of the crime." (42 Cal.2d 564.) The evidence there was "overwhelming that defendant was not sane." It included a long history of commitments to state institutions, occurring during a period which commenced many years before, and extended until after, the crime was committed, for a condition of permanent insanity of a type which would excuse legal responsibility for the criminal act. The court held that, although the evidence did not, as a matter of law, discharge the burden of showing insanity, it was sufficient to dispel the presumption of sanity and to require the giving of an instruction upon the contrary presumption.

It is unnecessary to decide whether the presumption which arises upon a showing of insanity of a permanent nature is sufficient, as a matter of law, to create a doubt as to the defendant's sanity at the time of trial. Contrary to Jensen's contention, neither the Baker case nor any other authority holds that "any commitment to a State insane hospital constitutes an adjudication of insanity and raises the presumption" discussed in the Baker case. There are no "State insane hospitals"; instead, certain hospitals are designated for the care and treatment of persons afflicted with specific mental and physical disorders. Although some of these institutions are limited in purpose to the care of particular classes of persons or types of afflictions, many of them serve the general purpose of "the care and treatment of the insane, the mentally

ill, and the mentally disordered." (Welf. & Inst. Code, § 6500.)

▇ No inference that a person is afflicted with a condition of permanent insanity arises solely from his commitment to such an institution. Under the Welfare and Institutions Code, one may be committed for several reasons other than for mental illness. (*Cf.* §§ 5350-5360 [narcotics addiction]; §§ 5400-5408 [addiction to habit-forming drugs or inebriacy]; §§ 5500-5521 [sexual psychopathy]; §§ 5600-5607 [mentally abnormal sex offender]; §§ 7050-7070 [defective or psychopathic delinquent].) Although in Jensen's case some of these possibilities would appear to be excluded because of the duration of his confinement (commitments limited to two years: Welf. & Inst. Code, §§ 5355 [narcotics addiction], 5406 [addiction to the use of habit-forming drugs or inebriacy], 5604 [mentally abnormal sex offender]), his commitment may well have been for a condition other than mental illness.

None of the psychiatrists reported that Jensen's commitment was because of insanity. One of them stated that his confinement initially was based upon a finding that he was a psychopathic delinquent. As used in the Welfare and Institutions Code, that term means "any minor who is mentally defective or psychopathic, and who is an habitual delinquent or has tendencies toward becoming an habitual delinquent, if his delinquency is such as to constitute him a menace to the health, person, or property of himself or of any other person, and the minor is not a proper subject for commitment . . . to a State hospital as an insane person. . . ." (§ 7050.)

Consistent with the conclusion, that Jensen has not shown a commitment because of insanity, is his account of his criminal history, as reported to the examining psychiatrists. Beginning at the age of 6 years, he was arrested almost yearly upon charges of burglary or petty theft. At the age of 12 he was committed to a state correctional school for one of those offenses. His commitment to a state hospital occurred when he was 14 years old. While on leave from the correctional school he committed a brutal murder. He twice escaped from the hospital; on one of those occasions he was arrested in another state on a charge of grand theft.

A contrary conclusion is not compelled by the fact that his commitment was to the Camarillo and Mendocino State Hospitals, designated by section 6500 of the Welfare and Institutions Code as "state hospitals for the care and treatment of the insane, the mentally ill, and the mentally dis-

ordered.'' The statute does not require these institutions to be used exclusively for the care of insane or mentally ill persons. Moreover, no provision of the articles relating to the commitment of a defective or psychopathic delinquent specifies the institution to which a commitment is to be made.

■ Jenson argues, however, that a finding that he was a defective or psychopathic delinquent is equivalent to a finding that he was insane. This argument is based upon the definitions of ''insanity'' and ''defective or psychopathic delinquent,'' given by the Welfare and Institutions Code, both of which describe such a person as dangerous to himself or others. (§§ 5040, 5041, 7050.) However, the Legislature has made a clear distinction between the two conditions. Sections 5040 and 5041 are included in a chapter dealing with ''Mentally Ill Persons and Insane Persons'' (div. VI, pt. 1, ch. 1) and describe the propensity for danger to themselves or others as resulting from a mental condition. Section 7050, which is in a chapter dealing with ''Defective or Psychopathic Delinquents'' (div. VI, pt. 4, ch. 4) describes that propensity as resulting from the delinquency of one who is mentally defective or psychopathic. (*Cf. People* v. *Thompson,* 94 Cal. App.2d 578, 585 [211 P.2d 1].)

■ Certain other statements appearing in the reports of the psychiatrists who examined Jensen are relied upon as indicating a condition of doubtful sanity. These statements were that Jensen has a ''psychopathic personality,'' that he is ''hedonistic, immature and an extremely dangerous and homicidal type of individual,'' and a ''constitutional psychopath'' whose prognosis for a satisfactory adjustment to society ''seems hopeless.'' It is also pointed out that Jensen believed himself to be sane and advised the psychiatrists that he would not have entered a plea of not guilty by reason of insanity, but would have made his defense ''on legal grounds.''

These statements are taken out of context and, in any event, fall far short of establishing a doubt as to Jensen's ability to understand the nature of the proceedings taken against him and to conduct his defense in a rational manner. None of the psychiatrists believed that he was insane in either a legal or a medical sense. They agreed that he was oriented, possessed of normal insight, and that there was ''nothing to indicate that he was confused, amnesic, hallucinated or psychotic at any time.''

■ Also described as irrational is Jensen's conduct during the trial in withdrawing his plea of not guilty by reason

of insanity, refusing to testify in his own behalf, and in submitting to the trial judge his "objections" and motions for a mistrial and change of venue. In support of the former motion he asserted that he should have been allowed to plead guilty to the charges of assault with intent to commit murder and robbery (and apparently escape prosecution for the charge of kidnaping) and to be heard in argument on the motion to set the indictment aside. Another ground was that his attorney should have objected to certain exhibits and cross-examined certain witnesses more extensively. The prosecuting attorney and the trial judge, he asserted, were biased against him. These things, Jensen claimed, denied to him due process of law. The ground of the venue motion was that as a murder charge was pending against him in another county, both cases should be tried together.

This conduct does not create, as a matter of law, a doubt as to Jensen's ability to comprehend the nature of the proceedings and to conduct his defense. On the contrary, they indicate complete awareness of what was happening. The withdrawal of his plea was done on the advice of counsel, and in view of the circumstances of the case his refusal to testify may well have appeared to be the wiser course at the time.

Nor do the statements made in support of his written "objections" and motion compel a doubt as to his sanity. His criticisms of counsel and of the trial judge reflect a rather common belief of some litigants that they are better qualified to direct the course of trial than their attorneys, and that the trial judge is biased when ruling adversely to them. These, and other statements, present his disagreement with rulings on points of law and the manner in which the case should be defended, but not a failure to comprehend the nature of the proceedings.

■ The deputy district attorney argued to the jury the possible effect of a sentence of life imprisonment without possibility of parole, stating that the power lay with the Governor or the Legislature at a later time to commute it and permit Jensen's release. Although no objection was taken to this argument, Jensen now asserts that it was prejudicial error of a type which could not be rectified by an objection and instruction to the jury to disregard it.

In *People* v. *Barclay*, 40 Cal.2d 146 [252 P.2d 321], the court, after reviewing cases in which similar statements had been made, said: "The recent decisions of this court . . .

establish that a jury may consider the consequences of a recommendation of life imprisonment in determining the punishment of the defendant, although it may not consider the possible penalties in determining the guilt of the defendant." (P. 158.) Without question, the argument in the present case was made with reference to fixing the penalty. In form, what was said is quite similar to the statements found unobjectionable in *People* v. *Chessman*, 38 Cal.2d 166, 189 [238 P.2d 1001], and in *People* v. *Byrd*, 42 Cal.2d 200, 207 [266 P.2d 505].

The judgment and order are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied November 24, 1954.