[Crim. No. 10984. In Bank. Sept. 12, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. ALBERT RUSSEL LAUDERMILK, Defendant and Appellant.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Albert Russel Laudermilk, in pro. per., David Lucchesi, under appointment by the Supreme Court, and William R. McBay, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C .Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

SULLIVAN, J. — Defendant appeals from a judgment, entered upon a plea of guilty, convicting him of first degree murder (Pen. Code, §§ 187, 189)[1] and sentencing him to life imprisonment (§ 190).

On August 25, 1964, defendant was charged by indictment with the murder of his former wife. Upon arraignment, the public defender was appointed to represent him. He pleaded not guilty, demanded a jury trial, and the cause was set for trial on November 9, 1964. A month later, by leave of court, he entered pleas of not guilty and not guilty by reason of insanity. Thereafter, since the case involved a capital offense for which the district attorney was demanding the death penalty, and the court felt that an otherwise heavy case load prevented the public defender from giving it adequate attention, the court pursuant to section 987a appointed Mr. Glithero to represent defendant and pursuant to section 1027 appointed two psychiatrists, Doctors W. S. Musfelt and M. L. Palestine, to examine him. The cause was reset for trial on November 30, 1964.

Both doctors examined defendant within a few days and filed their reports with the court well before the above trial date. The circumstances of the killing, as revealed by the reports, may be summarized as follows: About 12:30 a.m. August 20, 1964, police were called to the house of defendant's former wife, Ethel Gladys Laudermilk, where she lived with her four children. She was found slumped over in the front seat of her car, apparently dead from five bullet wounds. Defendant was found on the floor of the garage with a bullet wound in his chest. The shooting had taken place only

---

[1]Hereafter, unless otherwise indicated, all section references are to the Penal Code.

minutes before and had been observed by the four children. When police first arrived defendant was conscious and admitted shooting Gladys. One of the children overheard defendant state moments before the shooting: "Gladys, I don't want to kill you, but it looks as if I am going to have to." Defendant was taken to a hospital where he again confessed the killing.

Dr. Musfelt's report in pertinent part states that defendant was born in 1927 in Georgia; that he gave no family history of nervous or mental disease; that according to defendant his "birth and early development was normal so far as he knows and he can remember no serious illnesses or injuries"; that he was raised on a low economic level, suffered much privation, had only a third grade education "but he is literate"; that defendant was twice married and twice divorced; that he married Gladys in 1956 and claimed "to have gotten along well" with her until about 1962 when financial difficulties caused him to be "nervous"; that shortly thereafter, while they were living in Colorado, according to defendant he "developed the delusion that his wife was having affairs with various men. He became very suspicious, beat up on her, threatened repeatedly to kill her and also to kill himself"; that defendant said his wife repeatedly called the police because of his behavior; that she finally obtained a divorce and defendant "tells of himself then going rather beserk [sic]. Of his being very nomadic and drinking to excess for a number of months"; that he and his wife finally came to California in June 1964 but did not live together; that defendant's "suspicions of her infidelity continued and he repeatedly threatened her life, the lives of her children and also people she became acquainted with. Police records confirm this."

Dr. Musfelt's report further states: "In 1963 and 1964 the patient sought psychiatric help in Denver, Colorado. He was admitted to two or three psychiatric hospitals for from a few days to a few weeks. Records of these hospitals indicate that the staff doctors considered him to be mentally ill, but not psychotic and not in need of supervision, care and treatment. According to the patient they told him nothing could be done for him. Mental examination of patient revealed him to be literate and he seemed to have normal intelligence. He was quiet and cooperative on examination. He did not seem fearful or suspicious. It was not difficult to hold his attention. He comprehended my questions quite well. Some of his answers were not very logical and not truthful. . . . The

patient's memory was good for both recent and remote events except as above. There was no history related of previous amnesic attacks. Patient was oriented in all three spheres, not delusional or hallucinated and his reasoning did not seem impaired. He was only mildly depressed. . . . From history and clinical findings it is my opinion patient was legally sane at the time of the act with which he has been charged and is legally sane at the present time.''

Dr. Palestine's report states: that defendant gave him details of personal and family history and of his marriage with the victim which appear to us substantially the same as those recounted by defendant to Dr. Musfelt; that defendant said that after one of the incidents in Colorado, the police took him to a hospital for observation, which ''kept him only a short time and released him, he claims, as a paranoid''; that he said that he was admitted to the Veterans' Hospital, ''stayed only a short time and they let him go with the same impression''; that ''No adequate history is obtainable as to the details of his activities in Colorado or the circumstances concernng his mental examinations while there''; that he persistently denied ''that he has had any arguments with the wife, that he had ever had any intent to kill her.''

Dr. Palestine further states that during his ''mental examination'' of defendant, the latter's general attitude and behavior was ''good'' and defendant attempted to be cooperative and friendly; that on questions leading up to the shooting, he ''showed evasion''; that in respect to ''emotional status, affect and mood,'' defendant ''appeared quite depressed. He showed no affect whatsoever. There were no apparent mood swings''; that defendant ''did not appear to show any delusional ideation . . . and thought processes were well organized''; that he ''seemed to understand fully well,'' was ''well oriented in all spheres'' and his ''general intelligence appeared to be average''; and that defendant's memory of remote events was intact but he denied any recollection of events involving the shooting. The doctor was of the opinion that if, as defendant claimed, he had been considered a paranoid when examined in Colorado, recommendations for a commitment to an institution would have been made and ''it is impossible to believe that he was considered this type of threat''; that defendant was ''Quite aware, I am certain, of the extent of the seriousness of this offense and he apparently is aware of the difference between right and wrong. It is also certain that at the time of the offense, he was in the sane state

of mind and was aware of what he was doing. His loss of memory of the offense can well be an assumed one, this may be an hysterical situation with an unconscious manifestation of it. The chances are that the accusations he made against his wife of her infidelity are fact rather than fictitious. Although this man may have been severely depressed at the time of the incident in that he made a definite suicidal attempt, it is my opinion that at that time he was not psychotic or mentally ill and was in full awareness of what he was doing and that he should be considered as sane at the time of the offense.''

When the case came on for trial on November 30, 1964, and before commencement of the trial, defendant's counsel in chambers moved the court to suspend criminal proceedings pursuant to section 1368[2] on the ground that defendant was not capable of assisting in his own defense as appeared from his conduct on that day and for the previous week and a half.[3] The judge stated that he had read the reports of Doctors Musfelt and Palestine and ''the three others here'' and that ''there is nothing in any of them to indicate any more than a personality disturbance.'' He further said that there was nothing in the medical reports that would lead ''even to a suspicion'' that defendant was unable to assist in his defense.

Defendant thereupon requested and was granted permission to speak. He then related in some detail his difficulties in Colorado, his apprehension by the police, his examination at two hospitals in that state and his eventual divorce, substantially as he had furnished such information to Doctors Musfelt and Palestine. The record discloses that he understood the judge's questions directed to him and that he gave lucid responses. The court thereupon denied defense counsel's motion for a present sanity hearing but indicated that it would appoint a third psychiatrist, Dr. Frank V. Hoffman, to examine defendant.

---

[2] Section 1368 provides: ''If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded; and, from the time of such order, all proceedings in the criminal prosecution shall be suspended until the question of the sanity of the defendant has been determined, and the trial jury in the criminal prosecution may be discharged, or retained, according to the discretion of the court until the determination of the issue of insanity.''

[3] His counsel, Mr. Glithero, stated: ''I can get nothing lucid from him in the slightest, nothing. As of about a week and a half ago it's 'All I want to do is die.' As of today, 'If they had given me help at Colorado Hospital I wouldn't have done this. Where are my children?' ''

Proceedings were then commenced in open court and a jury was impaneled and sworn. After the noon recess, the prosecuting attorney made his opening statement. The contents of the opening statement apparently came as a surprise to defense counsel, for he approached the bench and said: "I didn't know this was going to happen. Let me talk to him [defendant] again. . . . I didn't have the faintest idea this is the way it happened." At defense counsel's request, the court ordered a recess so that said counsel could discuss the case with defendant. An off-the-record discussion ensued between them. Proceedings were then resumed in open court in the absence of the jury. Defendant withdrew his pleas of not guilty and not guilty by reason of insanity and entered a plea of guilty,[4] and the prosecutor and defendant then stipulated that the court fix the degree of the crime as first degree. The jury was discharged, and the case was continued until December 16, 1964, for the taking of evidence as to punishment (see § 190.1) and for the pronouncement of judgment. The judge inquired of defense counsel whether he still wished to have a third psychiatrist appointed and, upon receiving an affirmative answer, stated that he would do so under section 1027. He indicated to the prosecutor that unless the latter desired to present something, the probation, presentence report and "my doctor's report" would be sufficient, that it would not be necessary to have the doctors present, and that "we will see what Dr. Hoffman has to say."

Dr. Hoffman examined defendant on December 4, 1964, and filed a report dated December 8, 1964, which in pertinent part states: "MENTAL STATUS: The patient appears dejected and rather affectless. He was noted to cry on occasion, and appeared to be at least moderately depressed. . . . His entire history was given in a rather disconnected fashion, with many of his answers being 'I don't know' or 'I can't remember.' He appears to use the mechanism of denial to a marked degree when faced with any unpleasant thoughts or recollections. Much of his speech has a paranoid flavor. He tends to feel that numerous persons have been against him. Considerable hostility was evidenced towards the doctors for not having cured him, the courts for having taken his children away from

---

[4]The record discloses the following: "MR. GLITHERO: It is Mr. Laudermilk's desire at this time, Your Honor, to change his plea, as I understand it; is that correct, Mr. Laudermilk? THE DEFENDANT: Yes, Your Honor." By his affirmative answers to the court's questions defendant indicated that he understood he was pleading guilty to first degree murder, that he was entering the plea after discussion of the matter with his counsel and that he was sure that this is what he desired to do.

him and his deceased wife, who he felt was responsible for him having left Georgia in the first place, for running around with other men. There was no definite sign of an organic brain syndrome. The patient appeared to be about average intellectually. There was no impairment in orientation, and it was felt that his alleged memory defects were not on the basis of an organic disturbance.

"There was no evidence of an overt psychosis. The patient was not concrete in his responses, there were no frank delusions, and no hallucinations were admitted to. It did not appear that this defendant was truly aware of the seriousness of his disorder, and he had no insight into his unrealistic attitudes. In my opinion, the defendant is able to ascertain right from wrong, and would be able to assist in his defense. He cannot be classified as overtly psychotic, but does appear, however, to have a mental illness which is of long standing, and is of sufficient severity to have resulted in the committing of an act of homicide and attempted suicide. According to the records, this defect in the patient's reasoning and his resultant actions have been commented upon on numerous occasions in the past, and appeared to be no less present at this time.

"PSYCHIATRIC IMPRESSION: (1) Paranoid personality, severe. (2) Depressive reaction.

"RECOMMENDATIONS: In my opinion, this defendant should be placed in an adequate psychiatric facility under the jurisdiction of the penal system and afforded whatever treatment is available. It is my opinion that if this is not done, he will in the future, with comparatively little provocation, constitute a danger to others and will probably at the first opportunity do away with himself."

The report of the probation officer dated December 7, 1964, refers to the above-mentioned report of Dr. Musfelt and to a report of Dr. John A. Hunter, dated September 16, 1964, addressed to the district attorney. As quoted therein, Dr. Hunter's report states: "there is nothing to suggest that the defendant is overtly paranoid, but he could probably be regarded as a paranoid type of personality, if only because of his many expressions of pathological hostility in the past. However, it is characteristic of a paranoic to be able to put up a very normal facade while he harbors many delusional ideas." Noting that a complete diagnosis could not be made absent the records from the Colorado institutions, Dr. Hunter's report further states: "With the evidence which I now have, it is my opinion that the patient is not psychotic,

mentally ill, or insane in either the medical or legal senses, and that the same condition prevailed at the time of his offense. He knew the difference between right and wrong, and at the present time he knows the nature and extent of his offense, and is able to assist in his own defense.'' The probation officer who interviewed defendant said defendant ''understood the questions and seemed to answer logically and truthfully. . . . His statements of his relationships with his wife and friends are contrary to the facts as evidenced by official agencies, but he apparently believed his own statements.

''This defendant reflects serious, deep-rooted emotional problems, and we agree that he reflects many of the facets of the paranoid personality.''

On December 18, 1964, the cause came on for further proceedings. In response to the court's inquiry as to whether there was ''Anything further,'' counsel for defendant replied that ''we concur wholeheartedly with the psychiatric report of Dr. Hoffman, and particularly the last paragraph. . . . We do not concur in even the slightest with the other two psychiatrists' reports. . . . It would appear to counsel then that an adequate space of time, not necessarily life, in a good psychiatric place be the sentence.''[5] Upon inquiry by the court, the prosecutor then made a statement[6] concluding ''I would strongly urge as a representative of the District Attorney's Office that the Court not impose the death penalty and punishment be fixed with life imprisonment and a strong recommendation the time be served in an appropriate psychiatric facility as recommended by Dr. Hoffman, a place such as Atascadero. With that, Your Honor, we submit it.'' Thereupon the court, addressing defendant and summarizing the proceedings theretofore had, stated: ''It is my understanding that you desire to waive a jury in all particulars and ask that the Court, without a jury, in its discretion, fix your punishment either at death or life imprisonment; is that correct, Mr.

[5]The following colloquy then took place: ''THE COURT: I have no discretion as to that, Mr. Glithero. MR. GLITHERO: I realize. THE COURT: The only discretion I have, if you can call it discretion, is whether the man should pay the penalty of death or life imprisonment.''

[6]He stated in part: ''After reading Dr. Hoffman's report, I feel and I think the District Attorney's Office feels that this adequately gives the true picture of the case to Your Honor. Despite the severity of what the defendant did, in view of his mental or emotional problem which was not apparently a psychosis, but was a personality disorder, it certainly is something that should be considered. I personally don't see where any purpose would be served in executing the defendant in this type of case.''

Laudermilk?'' Defendant replied in the affirmative. The court thereupon sentenced defendant to prison for life, directing the sheriff to deliver defendant into the custody of the Director of Corrections at the California Institution for Men at Chino.[7] Judgment was entered accordingly. This appeal followed.

Defendant contends that the failure of the trial court to order a hearing on the issue of his present sanity in accordance with section 1368 denied him due process of law and that, at the time of entering his plea of guilty, he did not have the capacity to understand the nature and consequences of the plea.

Before taking up these contentions, we must dispose of a preliminary procedural question, namely, whether defendant can appeal from a judgment of conviction entered upon a plea of guilty.[8] Since a plea of guilty constitutes a conviction (*Stephens* v. *Toomey* (1959) 51 Cal.2d 864, 869 [338 P.2d 182]; *People* v. *Jones* (1959) 52 Cal.2d 636, 651 [343 P.2d 577], cert. denied 361 U.S. 926 [4 L.Ed.2d 350, 80 S.Ct. 364]; *People* v. *Hickman* (1928) 204 Cal. 470, 483 [268 P. 909, 270 P. 1117]; *People* v. *Goldstein* (1867) 32 Cal. 432, 433) and indeed has been called ''the highest kind of conviction which the case admits'' (*People* v. *Hickman, supra,* at p. 476), it has been stated as a general principle that the ''judgment entered on the plea of guilty is not appealable on the merits''

---

[7] The court added: ''I question very much if the man can be placed in Atascadero. Both Vacaville and San Quentin and, for that matter, Chino, have psychiatric facilities that are equal to Atascadero. I am very sure they will see fit to place him in an appropriate place. I order and direct the Pre-Sentence Report together with all psychiatric reports and other reports accompany the commitment.''

[8] Section 1237.5 (added to the Pen. Code by Stats. 1965, ch. 1924, § 2 and in effect September 17, 1965) provides: ''No appeal shall be taken by defendant from a judgment of conviction upon a plea of guilty or nolo contendere, except where: (a) The defendant has filed with the trial court a written statement, executed under oath or penalty of perjury showing reasonable constitutional, jurisdictional, or other grounds going to the legality of the proceedings; and (b) The trial court has executed and filed a certificate of probable cause for such appeal with the county clerk.'' Rule 31(d), Cal. Rules of Court, implementing the above statute became effective on the same date. The statute and rule *do not apply to* an appeal in which the notice of appeal was filed prior to September 17. (*People* v. *Brotherton* (1966) 239 Cal.App.2d 195, 197, fn. 1 [48 Cal.Rptr. 513].) Defendant dispatched his notice of appeal June 1, 1965, and on August 20, 1965, the Court of Appeal ordered it filed belatedly pursuant to rule 31(a) of the Cal. Rules of Court. Therefore, defendant was not obliged to obtain a certificate of probable cause for appeal from the trial court. Case law applicable to appeals commenced prior to the effective date of section 1237.5 covers the instant case.

and irregularities not going to the jurisdiction or legality of the proceedings will not be reviewed. (*Stephens* v. *Toomey, supra,* at p. 870.) Under the circumstances then permissible appellate review must be confined to irregularities disclosed by the record and going to the jurisdiction or to the legality of the proceedings.

■ A claim that the trial court accepted a guilty plea from a defendant or entered judgment against him without having conducted a hearing on his present sanity despite substantial evidence raising a doubt of his sanity is an allegation of fundamental error. The error is jurisdictional in the sense that the trial court has no power to pronounce judgment in such a case. (*People* v. *Pennington* (1967) 66 Cal.2d 508, 521 [58 Cal.Rptr. 374, 426 P.2d 942].) The error goes to the legality of the proceedings because "conviction of an accused person while he is legally incompetent violates due process, . . ." (*Pate* v. *Robinson* (1966) 383 U.S. 375, 378 [15 L.Ed. 2d 815, 818, 86 S.Ct. 836].) Appeals raising this issue have been permitted in numerous cases where the defendant pleaded guilty. (E.g., *People* v. *Scott* (1881) 59 Cal. 341; *People* v. *Gallantier* (1941) 47 Cal.App.2d 148 [117 P.2d 431]; *People* v. *Huntoon* (1919) 41 Cal.App. 392 [182 P. 776].)

We therefore conclude that the contentions now made by defendant raise questions as to irregularities going to the jurisdiction and legality of the proceedings and that the instant appeal properly lies for the purpose of reviewing them. To the extent that it is inconsistent with this conclusion, *People* v. *Hunsaker* (1963) 218 Cal.App.2d 475 [32 Cal.Rptr. 792], is disapproved.

We now turn to defendant's claim that the trial court erred in failing to order a hearing on the question of his present sanity (§ 1368, see fn. 2, *ante*). ■ Section 1368 implements a fundamental canon that a "person cannot be tried, adjudged to punishment, or punished for a public offense, while he is insane" (§ 1367). A defendant is sane within the meaning of section 1368 "if he is able to understand the nature and purpose of the proceedings taken against him and to assist counsel in the conduct of a defense in a rational manner, . . ." (*People* v. *Brock* (1962) 57 Cal.2d 644, 648-649 [21 Cal.Rptr. 560, 371 P.2d 296]; *People* v. *Pennington, supra,* 66 Cal.2d 508, 515; *People* v. *Merkouris* (1959) 52 Cal.2d 672, 678 [344 P.2d 1], overruled in part in *People* v. *Pennington, supra*; *People* v. *Jensen* (1954) 43 Cal.2d 572, 576 [275 P.2d 25]; *People* v. *Aparicio* (1952) 38 Cal.2d 565, 567 [241 P.2d 221].)

█ Recently in *Pennington, supra,* we felt compelled to revise our interpretation of section 1368 so as to comply with due process requirements pertinent to this area of the law as enunciated in the United States Supreme Court decision of *Pate* v. *Robinson, supra,* 383 U.S. 375, 378 [15 L.Ed.2d 815, 818, 86 S.Ct. 836].[9] We said in *Pennington:* "*Pate* v. *Robinson* stands for the proposition that an accused has a constitutional right to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense. Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence—testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary. . . . [W]hen defendant has come forward with substantial evidence of present mental incompetence, he is entitled to a section 1368 hearing as a matter of right under *Pate* v. *Robinson, supra,* 383 U.S. 375. The judge then has no discretion to exercise." (66 Cal.2d at p. 518.)[10]

Paraphrasing our remarks to another context, the question as to what constitutes such substantial evidence in a proceeding under section 1368 "cannot be answered by a simple formula applicable to all situations." (*People* v. *Wolff* (1964) 61 Cal.2d 795, 805 [40 Cal.Rptr. 271, 394 P.2d 959].) In *Pennington,* sufficient evidence of such incompetence consisted of the following: The expert opinion of a qualified psychologist based upon a previous diagnosis of schizophrenia and paranoia, a current diagnosis of a more paranoid condition, defendant's current unfeigned hallucinations, and defendant's fits of psychotic furor observed by the witness in the courthouse and during the trial;[11] similar expert testi-

---

[9]Defendant in a brief filed in the Court of Appeal prior to our decision in *Pennington* relied principally on *Pate* v. *Robinson.*

[10]Of course a trial judge is entitled, in his discretion, to order a present sanity hearing in circumstances where evidence of incompetence is not so substantial that the hearing is constitutionally required. (*People* v. *Pennington, supra,* 66 Cal.2d 508, 518; *People* v. *Merkouris, supra,* 52 Cal.2d 672, 678-679.) Under pre-*Pennington* law the judge's ruling would be disturbed only upon proof of an abuse of discretion or the existence of a doubt of sanity as a matter of law. Since neither abuse of discretion nor a doubt as a matter of law can possibly appear absent substantial evidence of incompetence, appellate court inquiry need go no further than a determination of whether such substantial evidence was adduced.

[11]Defendant interrupted the trial with comments, curses and shouts to the spectators, displayed his penis to the spectators, and was finally ordered to be gagged.

mony during the trial of a psychiatrist based on defendant's medical history of schizophrenia paranoid and the witness' own previous diagnosis, defendant's unfeigned hallucinations in which he heard voices, frequently those of the devil, and the witness' finding that the defendant was then suffering from an acute mental sickness in which he was delusional and out of contact with reality; and the testimony during trial of a consulting psychologist that the defendant was at that time actively hallucinating and grossly insane. We held that the testimony of the first psychologist ''was, by itself, substantial evidence which compelled the court to order a section 1368 hearing.'' (*People* v. *Pennington, supra,* 66 Cal.2d 508, 519.)

In *Pate* v. *Robinson, supra,* 383 U.S. 375, sufficient evidence consisted of the testimony of four lay witnesses (the defendant's mother, grandfather and aunt and a close family friend) as to a long history of disturbed behavior suggesting mental illness, the expressed opinion of all four that defendant was insane, and additional evidence as to his brief confinement in a state mental hospital.

We recognize, of course, that the requisite substantiality of evidence to raise a doubt under section 1368 may exist in less compelling degrees than it did in *Pennington* where we observed that ''it appears beyond *possibility* of dispute'' (italics added; *People* v. *Pennington, supra,* 66 Cal.2d 508, 519.) A reference to pre-*Pennington* cases, however, while of some help in placing the problem in perspective, seems to be of limited practical value since they did not apply the test prescribed by *Pate* and *Pennington.* We advert briefly to examples of two categories of cases—first those where an abundance of evidence required reversal of convictions because the trial judge abused his discretion in denying a section 1368 hearing or because the necessary doubt appeared as a matter of law and, second, those cases where the quality of the pertinent evidence clearly established its inadequacy to raise such doubt.

In *People* v. *Aparicio, supra,* 38 Cal.2d 565, judgment of conviction of murder imposing the death penalty was reversed because the trial court *abused its discretion* in denying a section 1368 hearing, a basis for reversal declared in *People* v. *Merkouris, supra,* 52 Cal.2d 672, 679, and several other decisions of this court and recognized by us in *Pennington.* (See *People* v. *Pennington, supra,* 66 Cal.2d 508, 516.) There the defendant had been committed several times to a state mental institution and various psychiatrists on the staff tes-

tified during the trial on his plea of not guilty by reason of insanity as to his mental condition during the month before his trial, stating that he was suffering from "delusions of persecution and hallucinations," that he was " 'paranoid and delusional,' " and that he was "possibly psychotic from a psychiatric point of view even though he was not legally insane" (in the M'Naughton sense). Other witnesses testified to previous instances of misconduct; there was also evidence of irrational behavior during the trial. This court said that the "evidence reveals a continuous course of irrational conduct upon the part of the defendant. His actions during all of the proceedings cast grave doubt on his sanity within the meaning of section 1368." (38 Cal.2d 565, 570.) It is clear that if the evidence established abuse of discretion under *Merkouris, a fortiori* it was more than sufficient to meet the test of *Pennington*. In *People* v. *West* (1914) 25 Cal.App. 369 [143 P. 793], defendants, who were inmates and patients of Mendocino state hospital for the insane, were convicted of the second degree murder of another inmate of the hospital. Denial of their motion for a present sanity hearing was held to be prejudicial error since "the circumstances here were such that it should be *held as a matter of law that a doubt was or should have been created. . . .*" (Italics added.) (25 Cal. App. at p. 373.)

An examination of decisions falling into the second category leaves us with the conviction that even under the substantial evidence test of *Pate* and *Pennington* more is required to raise a doubt than mere bizarre actions (*People* v. *Kroeger* (1964) 61 Cal.2d 236, 243-244 [37 Cal.Rptr. 593, 390 P.2d 369]) or bizarre statements (*People* v. *Williams* (1965) 235 Cal.App.2d 389, 398 [45 Cal.Rptr. 427]) or statements of defense counsel that defendant is incapable of cooperating in his defense (*People* v. *Dailey* (1959) 175 Cal.App.2d 101, 108-109 [345 P.2d 558]) or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense (*People* v. *Jensen, supra,* 43 Cal.2d 572, 579).

With the foregoing in mind and applying the rules announced in *Pate* and *Pennington* to the facts of the case at bench, we are satisfied that defendant did not produce substantial evidence of present mental incompetence so that it could be said that a doubt as to defendant's present sanity was raised in the mind of the trial judge and the latter was

compelled to order that the question as to defendant's sanity be determined by a trial. Our conclusion is reached after an examination of all the pertinent evidence before the trial court. As we have indicated, this consists of the medical reports of Doctors Musfelt, Palestine, Hoffman and Hunter and other relevant parts of the probation report. Only the reports of the first two doctors were before the court at the time defendant's counsel moved for a present sanity hearing under section 1368, the reports of Doctors Hoffman and Hunter having been presented after the motion was denied. This is immaterial for as we said in *Pennington* section 1368 required the trial judge "to consider *all* evidence of present insanity *presented to him prior to sentencing* and to order a hearing *on his own motion* if the evidence raises a doubt of the accused's competence to stand trial." (Italics added.) (*People* v. *Pennington, supra,* 66 Cal.2d at p. 520.) Although not evidence strictly speaking, we have also included within the scope of our scrutiny the statements of defense counsel already referred to. While we intimate no rule ascribing probative value to such statements in all instances, nevertheless in the present situation counsel was describing and representing to the court his own personal experiences with and observations of his client. We regard these statements of a responsible officer of the court as tantamount to sworn testimony.

It is clear that defendant can find no support in the reports of Dr. Musfelt or Dr. Palestine. The former found defendant to be literate, of normal intelligence, quiet and cooperative, not fearful or suspicious, not delusional or hallucinated and only mildly depressed. It was his opinion that defendant was legally sane at the time of the killing and legally sane at the present time. Dr. Palestine found defendant to be "good," friendly and cooperative in his general attitude, evasive as to questions about the shooting, "quite depressed" in mood, well organized and without delusions in his thought processes, well-oriented, of average intelligence, and with memory of remote events intact. He found it impossible to believe defendant's story about being considered paranoid in Colorado. It was his opinion that defendant was sane at the time of the killing. While Dr. Palestine did not express an opinion as to defendant's present sanity, his report indicates in no way that the doctor felt defendant was unable to understand the nature and purpose of the criminal proceedings or to assist in his own defense; indeed the entire report is quite to the contrary.

The statement of defendant's counsel, Mr. Glithero, made to the court on the day of trial, while of some significance, in our view cannot raise the requisite doubt and, even if considered in combination with other evidence as we discuss *infra*, is of limited probative value. Although he asserted that defendant "is not capable . . . of assisting in his own defense," the record reveals this as the lawyer's conclusion from an experience with an uncooperative client. (See fn. 3, *ante*.) It is noteworthy that counsel did not state to the court nor assert as the grounds of his motion under section 1368 that defendant was not "able to understand the nature and purpose of the proceedings taken against him. . . ." (See *People* v. *Brock, supra,* 57 Cal.2d 644, 648-649, and other cases cited *supra*.) Furthermore, while not discounting statements of counsel in proper cases, we hesitate to articulate a general rule requiring the trial court to grant a section 1368 hearing in every instance where defense counsel reports that his client is uncooperative or refuses or is unable to discuss the case. Such a rule would be fraught with risk that the administration of justice would be thwarted by defendants refusing to cooperate with their counsel or feigning incapacity to do so, so as to obtain a section 1368 hearing.

Nor can defendant obtain support from the probation report and Dr. Hunter's report included therein. The latter stated in plain and clear language that "at the present time [defendant] knows the nature and extent of his offense, and is able to assist in his own defense."

We therefore come to the report of Dr. Hoffman upon which defendant now heavily relies. It is noteworthy that the doctor in effect determined that defendant understood the nature and purpose of the proceedings against him,[12] and that, as we have set forth *supra*, while defendant appeared "dejected," "moderately depressed" and with much of his speech with "a paranoid flavor," he was about average intellectually and showed no "organic brain syndrome" or "impairment in orientation" and had no "delusions" or "hallucinations." The doctor opined that defendant was not "overtly psychotic" but appeared to have a "mental illness" of sufficient severity to have resulted in the homicide and attempted suicide. Stated merely as a "psychiatric im-

---

[12]The third paragraph of the report states: "Mr. Laudermilk stated that he was in jail because he killed his wife with a gun and then shot himself. It was his understanding that he was adjudged guilty of the crime and was now awaiting the court's decision as to disposition of his case."

pression" was that he had a "Paranoid personality, severe."

The crux of the report, however, for our present inquiry is found in the sentence: "In my opinion, the defendant . . . would be able to assist in his defense." Thus the report, by concluding that defendant was able to understand the nature and purpose of the criminal proceedings and to assist counsel in the conduct of his defense, establishes that defendant was sane within the meaning of section 1368. (See *People* v. *Brock, supra,* 57 Cal.2d 644, 648-649, and other authorities *supra.*) We cannot by a process of fragmentizing the report or fastening attention to isolated parts of it, substitute other conclusions for the expert opinion of Dr. Hoffman. To do so would be not merely to defeat the purpose of expert opinion evidence but to discard such evidence for mere psychiatric speculation clearly outside our province.

We conclude that, whether the foregoing evidence before the trial court be considered severally or in combination, there was not substantial evidence of defendant's present mental incompetence, that the evidence did not raise a doubt as to defendant's present sanity, and that the trial court was not required to grant a hearing under section 1368. None of the salient factors heretofore pointed out which compelled a different result in *Pate* and *Pennington* are present in the instant case. Furthermore, we find nothing in the record supportive of defendant's claim that he lacked the mental capacity to understand the nature and consequences of his plea of guilty.

The judgment is affirmed.

Traynor, C. J., McComb, J., Tobriner, J., and Burke, J., concurred.

Mosk, J., concurred in the judgment.

PETERS, J.—I dissent.

The sole point of any importance involved on this appeal is whether there was presented to the trial court any substantial evidence of the insanity of appellant so as to entitle him to the hearing required by section 1368 of the Penal Code.[1] If

---

[1]Penal Code section 1368 provides: "If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded; and, from the time of such order, all proceedings in the criminal prosecution shall be suspended until the question of the sanity of the defendant has been determined, and the trial jury in the criminal prosecution may be discharged, or retained, according to the discretion of the court until the determination of the issue of insanity."

such evidence was produced, no matter how strong the conflicting evidence may have been and no matter how weak was the evidence on behalf of appellant, provided only it was substantial, the trial judge was required to order a present sanity hearing as a matter of law.

This was not always the California law. For many years the California courts had held that the trial court on a motion under section 1368, and on conflicting evidence, had discretion to determine whether it had a "doubt" of sanity, and if not to deny the motion. (See *People v. Merkouris,* 52 Cal.2d 672 [344 P.2d 1], cert. den. 361 U.S. 943 [4 L.Ed.2d 364, 80 S.Ct. 411] ; *People v. Lindsey,* 56 Cal.2d 324 [14 Cal.Rptr. 678, 363 P.2d 910].) Under the compulsion of *Pate v. Robinson,* 383 U.S. 375 [15 L.Ed.2d 815, 86 S.Ct. 836], this court in *People v. Pennington,* 66 Cal.2d 508 [58 Cal.Rptr. 374, 426 P.2d 942], revised the rule of the *Merkouris* and *Lindsey* cases, *supra,* and disapproved portions of those opinions. The majority, in the instant case, hold that there was no substantial evidence of insanity within the meaning of section 1368, and that a sanity hearing was properly denied. In so holding, the majority, while purporting to recognize the fundamental changes in the law accomplished by the *Robinson* and *Pennington* cases, *supra,* give only lip service to those changes and in fact apply the now repudiated rules of *Merkouris* and *Lindsey, supra.* To say the least, the majority gravely, and in my opinion erroneously, limit the rule of the *Robinson* and *Pennington* cases, *supra.*

The proper rule, and the one adopted in the *Pennington* case, *supra,* is stated as follows (66 Cal.2d at p. 518) :

"*Pate v. Robinson* stands for the proposition that an accused has a constitutional right to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness. of understanding the nature of the proceedings against him or of assisting in his defense. Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence—testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary.

"When the evidence casting doubt on an accused's present sanity is less than substantial, *People v. Merkouris, supra,* 52 Cal.2d 672, 678-679, correctly states the rules for application of section 1368 of the Penal Code. Whether to order a present

sanity hearing is for the discretion of the trial judge, and only where a doubt as to sanity may be said to appear as a matter of law or where there is an abuse of discretion may the trial judge's determination be disturbed on appeal. But, when defendant has come forward with substantial evidence of present mental incompetence, he is entitled to a section 1368 hearing as a matter of right under *Pate* v. *Robinson, supra,* 383 U.S. 375. The judge then has no discretion to exercise. Insofar as *People* v. *Merkouris, supra,* 52 Cal.2d 672, and *People* v. *Lindsey, supra,* 56 Cal.2d 324, suggest that the judge, because he personally has no doubt as to the accused's sanity, may deny a section 1368 hearing despite substantial evidence of present insanity, they are overruled.''

In the *Pennington* case, *supra,* the evidence of insanity within the meaning of section 1368 was substantial, and the majority so admit. The evidence in *Pate* v. *Robinson, supra,* was not nearly so substantial, and yet the Supreme Court of the United States reversed a determination of the Illinois court that it had no doubt of sanity, and held that a hearing was required as a matter of law. We, of course, are bound by that opinion.

In *Pennington, supra,* this court summarized the evidence produced in *Pate* v. *Robinson, supra,* and commented on the applicable law, as follows (66 Cal.2d at p. 517): ''That evidence consisted of testimony by three of Robinson's close relatives and one family friend relating various acts of Robinson several years before the trial which suggested mental illness.[7] Two of the witnesses, Robinson's mother and aunt,

''[7]Robinson had been struck in the head by a brick at age seven and thereafter, according to his mother, ' ''acted a little peculiar.'' ' He once kicked a hole in the family bar for no apparent reason. He was sullen and frequently complained of headaches. He had been in many fights and had murdered his own infant son. He became 'noticeably erratic' when in the Army. His mother observed him on occasions with a ' ''glare in his eyes'' ' and once found him pacing the floor saying something was after him. She had also observed him ' ''a little foamy at the mouth.'' ' The family friend said that when she spoke to Robinson he either stared at the floor or looked at her 'glassy-eyed.' Robinson's grandfather testified that Robinson was 'not right'—often walked abruptly away from his work and often appeared in a daze. Robinson once quarreled with his wife and threatened to burn her clothes. He became so unruly he tried to knock down a door, and police were called. The aunt testified that Robinson acted strangely and that she had seen him ' ''stary-eyed'' . . . , prancing, nervous, and ''just staring wild.'' ' Robinson also once feared someone was going to kill him.

''Records from the Illinois mental hospital where he had been confined revealed that Robinson had been drinking heavily when admitted and that he had had hallucinations of voices, snakes, elephants, and other animals. (*Pate* v. *Robinson, supra,* 383 U.S. 375, 378-382, 15 L.Ed.2d 815, 818-820; *People* v. *Robinson, supra,* 22 Ill.2d 162, 164-166 [174 N.E.2d 820].)''

stated that in their opinion he was insane at the time of trial. His grandfather and the family friend testified that they considered him to be insane at unpredictable periods of time. It was also brought out that he had spent several weeks in a mental hospital some eight years before trial. But he was recovered from his illness when discharged and about two years later was adjudged sane in a restoration proceeding. It was stipulated at Robinson's murder trial that a psychiatrist who had examined Robinson had found him sufficiently sane to stand trial. In affirming Robinson's conviction, the Supreme Court of Illinois had held that the evidence did not 'raise a *bona fide* doubt as to . . . [Robinson's] present sanity.' (*People* v. *Robinson, supra,* 22 Ill.2d at p. 167.) It noted that the defense witnesses had based their conclusions that Robinson was insane or insane at times primarily on incidents occurring years before trial. Furthermore, the court noted, the record disclosed several instances during trial where Robinson displayed his ability to assist in his defense by making lucid and cogent legal arguments to the trial judge. (*Id.* at p. 168.)

''The United States Supreme Court held that neither the stipulation that a psychiatrist had found Robinson sufficiently sane to stand trial nor Robinson's lucid comments during the trial offered a 'justification for ignoring the uncontradicted testimony of Robinson's history of pronounced irrational behavior.' (*Pate* v. *Robinson, supra,* 383 U.S. at pp. 385-386, 15 L.Ed.2d at p. 822.) 'We believe,' states the court's holding, 'that the evidence introduced on Robinson's behalf entitled him to a hearing on this issue. The court's failure to make such inquiry thus deprived Robinson of his constitutional right to a fair trial.' (*Id.* at p. 385, 15 L.Ed.2d at p. 822.)''

Thus the evidence was conflicting in *Robinson, supra,* and the evidence of incompetence to stand trial was remote and not very strong. Yet it was held to be sufficient as a matter of law to entitle Robinson to a present sanity hearing.

In the instant case the evidence on the issue is much more substantial than it was in *Robinson, supra.* The majority opinion summarizes part of that evidence at some length. That very summary demonstrates more eloquently than any argument that I can make that substantial evidence of insanity within the ambit of section 1368 existed. Certainly that evidence demonstrated that Laudermilk had an uncontradicted ''history of pronounced irrational behavior'' more than did Robinson, and that is the test laid down in that case.

In *Robinson, supra,* the defendant had spent ''several weeks'' in a mental hospital eight years before his trial and was adjudged sane two years later. In the instant case appellant had been in a series of mental hospitals but a year or two before trial. In *Robinson, supra,* there was no expert testimony on behalf of the accused; here there was such testimony. Here the attorney told the court of his inability to communicate with the accused.

A reference to some of this testimony will demonstrate the substantial nature of the evidence of incompetency. The defendant was permitted to make a statement. He stated:

''When I was in Colorado I was accused of something I didn't do. The Court was throwed out. After that I tried to commit suicide. My wife stopped me from doing so. Of course, I blacked clear out. Don't know what all happened. When I got back to what I knew was going on, I got in the car, tried to leave by myself and she followed me. She went out and jumped in the car too. Anyway, she had the kids to call the cops and they locked me up. She sent me to the hospital and they said I was nuts or something, I don't know. Anyhow, when I got out of it they told me they couldn't do anything for me at this time. So three days later I went over in the VA hospital and I stayed over there, I don't know, three weeks, a month or so, and they turned me loose under the same condition, and Dr. Katz told me to go out to the State hospital and apply there.

''So I went out, made application, then they called the other two doctors and they told me there was nothing they could do for me and they couldn't put me on out-patient deal unless I went in the hospital, and after talking to the two other doctors there was nothing they could do. So they recommended me to go out to an out-patient deal out to the Jefferson County Hospital or Jefferson County Mental Health. I went out there and as things was going it didn't work out, so I tried running, I tried drinking, and nothing ever worked out. Meanwhile, the Court took my kids away from me because I was a nut and I couldn't write, call them, see them or anything else, put them on welfare. I had a job making good money, yet, I couldn't even help them at all. So we left there and came out here to try to get away from that Court. Of course, my wife was afraid the Court out here would find out about it and take them away from her permanently because the Judge told her she would have to get a divorce, restraining order on me and stay from me and if they

ever caught us together they would take them away from her permanent, and we had that trouble out here. There is nothing we can do about it. Who is wrong? These two doctors here or the doctors back there? Somebody is some place.''

''I met approximately five Boards, I imagine, I don't know, 15, 20 doctors on the Board. Society is going to condemn you; society refused to help you. Now they are going to hang me for it. Now, somebody is wrong some place.''

Then there is the report of Dr. Hoffman. He found the accused depressed and observed him crying at times during the examination. The accused expressed the wish to die if his mental illness could not be cured. ''His entire history was given in a rather disconnected fashion. . . . Much of his speech has a paranoid flavor.'' Hoffman found defendant of average intelligence, suffering no impairment in orientation. Hoffman observed no ''frank delusions'' and defendant admitted no hallucinations to him. The report states: ''It did not appear that this defendant [sic] was truly aware of the seriousness of his disorder, and he had no insight into his unrealistic attitudes. In my opinion, the defendent [sic] is able to ascertain right from wrong, and would be able to assist in his defense. He cannot be classified as overtly psychotic, but does appear, however, to have a mental illness which is of long standing, and is of sufficient severity to have resulted in the committing of an act of homicide and attempted suicide. According to the records, this defect in the patient's reasoning and his resultant actions have been commented upon on numerous occasions in the past, and appeared to be no less present at this time.

''PSYCHIATRIC IMPRESSION:

'' (1) Paranoid personality, severe. (2) Depressive reaction.

''RECOMMENDATIONS:

''In my opinion, this defendent [sic] should be placed in an adequate psychiatric facility under the jurisdiction of the penal system and afforded whatever treatment is available. It is my opinion that if this is not done, he will in the future, with comparatively little provication [sic] constitute a danger to others and will probably at the first opportunity do away with himself.''

The probation report, completed December 7, also bears on defendant's mental condition. It quotes another psychiatrist's report concerning defendant, one made in September 1964 by Dr. John A. Hunter at the request of the district

attorney. Dr. Hunter said he did not find defendant overtly paranoid, " 'But he could probably be regarded as a paranoid type of personality, if only because of his many expressions of pathological hostility in the past. However, it is characteristic of a paranoic [*sic*] to be able to put up a very normal facade while he harbors many delusional ideas.' "

The probation officer's report, among other things, stated: "This defendant reflects serious, deep-rooted emotional problems, and we agree that he reflects many of the facets of the paranoid personality."

When counsel for the accused made the motion for a hearing under section 1368 he stated that he was making the motion because the accused appeared to him to be too mentally deranged to assist in his defense; that for the previous one and one-half weeks the accused would only discuss three things: his desire to die, the whereabouts of his children, and the inability of the psychiatrists in Colorado to help him.

The prosecuting attorney was so impressed with the defendant's mental condition that he argued at the penalty hearing that death should not be imposed because of such mental condition.

It seems clear to me that when this record is read as a whole it raises sufficient doubt of defendant's sanity that the special hearing provided by section 1368 was required. It would seem to me that Dr. Hoffman's medical evidence, coupled with defense counsel's report, defendant's own statement, and the other reports, constitute the required substantial evidence of present insanity as defined for section 1368 purposes. They certainly show a "history of pronounced irrational behavior" and that is all that is required under *Robinson, supra.*

The statement of counsel, although not controlling, is entitled to some weight. While this statement that the defendant appeared unable to cooperate, for reasons set forth by the majority, does not by itself compel a section 1368 hearing, it cannot be completely ignored and is entitled to some significance. Otherwise, a conscientious lawyer faced with a client who is unable or unwilling to disclose possible defenses and otherwise to cooperate will be inclined to do what apparently defense counsel did in the instant case—ignore possible defenses, plead his client guilty and throw himself on the mercy of the court. The state, of course, has no legitimate interest in securing the conviction of a defendant who may have a defense but who because of his mental condition is unable to

defend himself. Therefore, when a competent, responsible at-torney makes representations to the court that his client is unable to cooperate, it should take little more to constitute "substantial evidence."

Far more than a "little more" such evidence is found in Dr. Hoffman's report. It is true that Dr. Hoffman does not direct-ly state that defendant is unable to cooperate in his defense, but such evidence is not required. There was no such evidence in *Pate* v. *Robinson, supra.* There the sanity hearing was re-quired merely because of an uncontradicted "history of pro-nounced irrational behavior."

The majority opinion seeks to disparage the Hoffman report by seizing upon the phrase appearing in the middle of it that defendant "would be able to assist in his defense." This is characterized by the majority as the "crux of the report." That is a misnomer. A mere reading of the portions of the report set forth in the majority opinion demonstrates that this is so. With far more justification the following findings and opinions of Dr. Hoffman can be classified as the "crux of his report."

He gave it as his impression that defendant had a "(1) Paranoid personality, severe. (2) Depressive reaction." That fundamental conclusion was fortified by his findings and ob-servations that he found defendant depressed and observed him "crying occasionally during the interview"; that he wished to die if his mental illness could not be cured; that "much of his speech has a paranoid flavor"; that defendant "does appear, however, to have a mental illness which is of long standing, and is of sufficient severity to have resulted in the committing of an act of homicide and attempted sui-cide"; and that the defects in defendant's memory and ac-tions "appeared to be no less present at this time."

The report concluded with the recommendation that de-fendant be placed in a mental hospital for treatment because without such treatment he would be a danger to others and "will probably at the first opportunity do away with him-self.'

This recommendation and the entire diagnosis strongly suggest that the reason defendant was not cooperating with his counsel was because his mental illness—paranoia with de-pressive reaction—rendered him incapable of doing so, in-capable of taking any steps that would tend to save his own life. Hoffman stated that defendant's severe and long-stand-ing mental illness had caused him to kill his former wife and

to attempt suicide. Hoffman further stated that this illness would cause defendant to take his own life at the first opportunity with comparatively little provocation. The criminal proceeding on the murder charge was such an opportunity. In my view, Hoffman's diagnosis coupled with defendant's history of mental illness and defense counsel's report that defendant was not cooperating but was brooding about death constitute substantial evidence that defendant was incapable, because of mental illness, of assisting in a course of conduct—his own defense—that would spare his life. Instead, he was compulsively driven to "do away with himself," as Hoffman phrased it.

To hold that the phrase that defendant was able to cooperate is the "crux" of Dr. Hoffman's report is to disregard the major portion of that report and to distort its meaning and impact. The majority treat the phrase as if it were the solemn final conclusion of Dr. Hoffman. It is no such thing. It is simply an incidental phrase that appears in the middle of the report. It is contradicted by what is said before the phrase and by what appears after it. At the very most it creates a conflict with the major portion of the report. Under the rules announced in *Pennington* and *Robinson, supra,* the trial court was required to disregard that conflict. The mere fact that the conflict appears within a single report and is not between two separate reports, makes no legal difference. (See 30 Am.Jur.2d, § 1082, p. 230.) The holding to the contrary in the majority opinion is simply wrong.

I conclude that when the trial court received, properly, as held by the majority, the Hoffman report, and the other evidence referred to, it had substantial evidence prior to judgment of incompetency of the accused to cooperate in his own defense, and under *Pate* v. *Robinson, supra,* as explained in *People* v. *Pennington, supra,* was compelled to grant a present sanity hearing.

For these reasons I would reverse the judgment.

Appellant's petition for a rehearing was denied October 25, 1967. Peters, J., was of the opinion that the petition should be granted.