Filed 12/19/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S133510 |
| v. | ) | |
| | ) | |
| ANDREW HAMPTON MICKEL, | ) | |
| | ) | Tehama County |
| Defendant and Appellant. | ) | Super. Ct. No. CR45115 |
| _____ | ) | |

On April 5, 2005, a jury convicted defendant Andrew Hampton Mickel of the first degree murder of Officer David Mobilio (Pen. Code, § 187),[1] and also found that Mobilio was a peace officer killed while engaged in the performance of his duties (§ 190.2, subd. (a)(7)). Three days later, the jury returned a verdict of death. The trial court automatically reviewed the verdict (§ 190.4, subd. (e)), declined to modify it, and sentenced defendant to death.

This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# I. BACKGROUND

## A. Guilt Phase

### 1. *Prosecution Evidence*

Defendant was a resident of Olympia, Washington. In October 2002, defendant purchased a Sig Sauer P229 .40-caliber handgun from Larry's Gun Shop in Olympia. Defendant also purchased several boxes of hollow-point bullets.

On November 17 of that year, a Tehama County deputy sheriff, while on duty, observed a maroon 1990 Ford Mustang with Washington state license plates. The deputy ran the plates through his patrol car computer because the vehicle "seemed out of place" and had "immediately turned" after the deputy pulled up in his patrol car behind the vehicle.

At about 6 p.m. the next evening, two witnesses drove to Red Bluff, California, located in Tehama County, for recreational off-road driving in the vicinity. The witnesses saw a maroon or red Ford Mustang parked off Breckenridge Road, approximately 300 to 400 yards from Warner's Petroleum in Red Bluff. The vehicle's front license plate was covered with a sheet secured with zipties, and the windows were fogged up. The two witnesses saw a person inside of the car, whom they described as looking startled and nervous. The Mustang remained parked when the two witnesses left the area approximately 20 minutes later.

On November 19, 2002, Red Bluff Police Officer David Mobilio was working patrol on the overnight shift. Around 1:27 a.m., Mobilio went to Warner's Petroleum to refuel his patrol car. Around 1:40 a.m., a dispatcher conducted a status check on Mobilio, but received no response. Another officer, Sergeant Ted Wiley, drove to Warner's Petroleum to check on Mobilio. Wiley

observed a patrol car parked by the gas pumps and Mobilio lying face-down at the north end of the pumps. Wiley did not see anyone else in the vicinity. After calling for assistance, Wiley approached Mobilio's body and saw a large circular wound to the back of the head. Next to Mobilio's body, Wiley saw an object that he thought was a piece of cardboard or paper that had some writing on it, as well as a drawing of a snake. The object, a homemade flag, had the phrase "This Is A Political Action. Don't Tread On Us" written below the image of a snake.

At 2 a.m., Red Bluff Fire Department Engineer Domenic Catona was dispatched to Warner's Petroleum. When Catona came closer to Officer Mobilio's body, he observed one bullet wound to the back of the head and another bullet wound just below the shoulder blades. On the ground directly to the left of Mobilio's body, Catona saw a three-foot cloth. The paramedic who examined Mobilio pronounced him dead at the scene. An autopsy later revealed that Mobilio had been shot three times from a distance of at least three to four feet. The forensic pathologist opined that the final shot was to the back of Mobilio's head, while he was lying face-down on the ground.

Later the same day, around 1 p.m., Alice Lay — who lived on her ranch in southeastern Oregon — learned of a car wreck on the road near her ranch. Lay and her son, Wilson, went to flag the wreck, as the accident was on a blind curve. When they arrived at the wreck, the Lays saw defendant standing by a small fire near the overturned vehicle. The vehicle did not have any license plates on it, and defendant had a bloody face. Wilson also observed empty shell casings on the ground, which he believed appeared to be .40-caliber or 9-millimeter.

Defendant acted a "little bit nervous" and explained that he had been driving too quickly before the car rolled when he hit the bank of the curve. When Alice asked defendant about the missing license plates, defendant explained he had thrown them away because he was going to abandon the car. Defendant

3

eventually located the plates. The Lays collected several of defendant's belongings that he insisted he was abandoning, including a gun case and a "brass catcher," which is designed to catch ejected rounds from a gun. Because defendant was injured, the Lays took him back to their home and called the police to report the wreck.

Deputy Tim Alexander from the Harney County Sherriff's Department in Burns, Oregon arrived and met with defendant. Defendant introduced himself as "Andrew McRae" and produced a Washington state driver's license. Defendant explained how the accident occurred and that he wanted to sign over the wrecked car and remaining belongings to the Lays. Alexander drove defendant to the wreck to investigate and take some photographs. Alexander observed the license plates leaning against the car, as well as tools on the ground. When Alexander searched defendant's backpack before driving defendant to the nearest town, Alexander found a loaded Sig Sauer .40-caliber handgun and a large quantity of ammunition. Alexander ran the handgun's serial number through dispatch, and the gun came back clean. After explaining to defendant that he could not take the weapon on public transportation, Alexander drove defendant to Burns.

On November 20, 2002, defendant purchased a bus ticket in Burns, and left the Sig Sauer handgun with an employee at the bus stop. Ballistics tests on the gun would later reveal that it was the weapon used to kill Officer Mobilio. Defendant then traveled to New Hampshire, where he was eventually arrested after he contacted the media to explain his actions.

During the investigation of the crime scene at Warner's Petroleum, investigators photographed and preserved tire and shoe impressions from the

original crime scenes.[2] A senior forensic scientist, Michael Barnes, later compared photographs of defendant's vehicle and tires to the photographs of the tire impressions and concluded the size and pattern were the same. Barnes compared the shoes defendant was wearing at the time of his arrest to the shoe impressions from Warner's Petroleum and nearby Breckenridge Road. Barnes opined that defendant's shoe made the impression from the Breckenridge scene, but could only conclude that the patterns were the same with respect to the impressions from Warner's Petroleum.

Following defendant's arrest in New Hampshire, law enforcement searched defendant's apartment in Olympia, Washington. They found additional ammunition, pieces of wire and cloth, and a "possible template" for the snake image on the cloth left at the scene. While the template for the snake image had unique edging that corresponded to the cloth flag found at Warner's Petroleum, it did not match the image in size.

The police obtained DNA swabs from wire attached to the cloth flag. A comparison of defendant's blood to samples taken from the DNA swabs of the flag revealed a mixture of DNA from two individuals, which an expert concluded was consistent with Mobilio as a minor contributor and defendant as a major contributor. Based on the odds of the major contributor's DNA appearing in unrelated individuals, the expert opined that it was very strong evidence that defendant was the major contributor.

Finally, the prosecution offered several inculpatory statements defendant had made in prior proceedings. These statements included: "Your Honor, I admit that I committed the act that resulted in Officer Mobilio's death," and "I have

---

[2] At trial, a criminalist described findings from the relevant crime scenes of Warner's Petroleum and the Breckenridge site.

never denied that I killed Officer Mobilio, and I never intend to deny that. And it will become clear to the jury, both by myself and by the prosecution, that there is no question of that fact."

### 2. *Defense*

On January 30, 2003, defendant first appeared in Tehama County Superior Court, where he stated his desire to represent himself and requested that a public defender be appointed as co-counsel. The court appointed Attorney James Reichle, who represented defendant through the preliminary hearing. On December 8, 2003, the trial court granted defendant's motion for self-representation. While defendant made an opening statement, he did not put on a defense during the guilt phase. During his opening statement, defendant explained that he "did ambush and kill Officer David Mobilio" and that he "came forward" to "take[] responsibility for being the one who took Officer Mobilio's life." Defendant conceded that the prosecution would "have the facts [of the murder] right," but that "they won't have the right interpretation for what really happened."

Defendant cross-examined nine of the 26 prosecution witnesses, but did not call any witnesses of his own. Defendant had previously indicated his intent to put on a justification defense based on the "defense of liberty." During an in camera proceeding, the trial court concluded that the defense was not legally cognizable and precluded defendant from introducing evidence in support of this proposed defense. Defendant responded by stating that he would "sit in silent protest during the guilt phase" and that he would "not speak or raise any issues until the penalty phase." Defendant gave a brief closing statement, stating that he would explain during the penalty phase why he had killed Officer Mobilio.

The jury deliberated for approximately 45 minutes before returning a verdict finding defendant guilty of first degree murder and finding true the special

6

circumstance that David Mobilio was a peace officer who was killed while engaged in the performance of his duties.

### B. Penalty Phase

At the penalty phase, the prosecution put on victim impact testimony from Officer Mobilio's family members, fellow police officers, and an elementary school student who Mobilio had taught as part of the nationwide Drug Abuse Resistance Education (DARE) program.

Defendant called his mother and father as witnesses to testify about the circumstances under which they learned of defendant's crime. Defendant presented testimony from a state investigator that the state could quickly retrieve digital information about automobile licenses and gun registration, as well as testimony from an expert in public administration regarding the existence of systems and databases aggregating personal information about United States citizens.

During the penalty phase, defendant also testified that he had acted out of a sense of patriotism. Defendant ultimately presented the theory that he had killed Officer Mobilio in order to defend constitutionally guaranteed liberties that he believed the government was infringing, including the right to bear arms. Defendant explained that he came to California to kill a police officer because he wanted his actions to make a national statement. He believed California to be the least gun-friendly state in the country, and where "the war on drugs is fought the hardest." Defendant traveled to California in September 2002 to find a location where he could ambush a police officer, drive back to Washington, and then fly to New Hampshire without being arrested. He explained that he had intentionally chosen New Hampshire as the location where he would be arrested because he believed the New Hampshire Constitution guaranteed the right of revolution.

When he arrived in New Hampshire, defendant contacted his parents and the media. When contacted by police, defendant explained that he would come peacefully, but that he wanted to speak with a reporter to explain what he had done. After speaking with the reporter, defendant surrendered himself to law enforcement and was arrested.

After both sides presented their evidence during the penalty phase, they concluded with arguments to the jury. The jury then returned a death verdict.

## II. DISCUSSION

### A. Issues Affecting Both Phases

#### 1. *Failure to Suspend Proceedings Prior to Trial*

Defendant claims the trial court erred in failing to suspend proceedings under section 1368 because there was substantial evidence that raised a doubt as to defendant's competence to stand trial. Defendant further argues that this failure violated his due process rights. We reject defendant's claim.

##### a. *Background*

As noted, after shooting Officer Mobilio and encountering the Lays and Officer Alexander, defendant purchased a bus ticket in Burns, Oregon. Defendant then fled to New Hampshire, where he was arrested on November 26, 2002. Following the People's application for requisition, the Governor of California formally requested defendant's extradition from New Hampshire to California on December 18, 2002.

On January 8, 2003, defendant's counsel in New Hampshire, Mark Sisti, filed a petition for a writ of habeas corpus in the New Hampshire Superior Court, alleging that defendant was incompetent to stand trial and therefore could not be extradited. According to the petition, Sisti had "immediate concerns regarding the Petitioner's ability to communicate with, and adequately assist counsel" and his

"lack of ability to understand the proceedings against him." In support of the petition, counsel referred to and attached a "preliminary psychiatric/competency evaluation" conducted by Dr. Drukteinis, where Dr. Drukteinis concluded that defendant's competency was "highly questionable because of his irrational thinking." Dr. Drukteinis had met with defendant for over two hours, reviewed one of defendant's writings, and interviewed defendant's mother by phone. Dr. Drukteinis noted that these were preliminary findings that would need to be assessed after a full psychiatric evaluation, but that there was evidence that defendant "suffers from a mental disturbance."

The New Hampshire Superior Court held a hearing on defendant's petition on January 14, 2003. The court then denied defendant's petition, concluding that competence is not required for extradition under either New Hampshire or federal law. The court further observed that defendant's ability to "calmly and methodically g[i]ve his account (of the murder) without any psychotic disorganization of thought" supported the conclusion that defendant understood and was capable of discussing the charges against him in California, as well as the extradition proceedings. Defendant was then extradited to California.

When defendant first appeared in Tehama County Superior Court on January 30, 2003, he expressed his wish to represent himself and to have a public defender appointed as co-counsel. The court appointed James Reichle, who subsequently stated his support for defendant's request to represent himself. After the trial court explained the advantages of representation and that defendant would not be waiving his right to self-representation during trial, defendant accepted Reichle's representation through the preliminary hearing.

On April 25, 2003, defense counsel filed a motion to seal eight categories of evidence and prevent their public disclosure during the preliminary hearing. Among these categories was "any mention of the extradition proceedings in New

9

Hampshire or any information presented therein, including the contents or sealing of the Drukteinis report" which was allegedly "divulged in violation of his attorney-client and psychotherapist privileges." After the People filed an opposition indicating that they did not intend to use any of the eight categories of documents at the preliminary hearing, the trial court denied defendant's motion without prejudice.

On July 7, 2004, defendant filed a motion for change of venue, which did not reference the Drukteinis report, but did reference former counsel Sisti's "attempt[] to lay the foundations for an Insanity Defense" before the New Hampshire state court. Defendant argued that Sisti had made "dramatic, unsubstantiated claims" that defendant could not identify himself, understand the proceedings, or understand the differences among the judge, the prosecution, and the defense.

In a filing concerning whether defendant should be physically restrained during proceedings, the People referenced defendant's uncooperativeness during his incarceration in New Hampshire. According to the People, defendant had obstructed jail personnel and refused to dress. Defendant chose to be covered by a blanket and made a court appearance via closed circuit video monitor in that state of undress.

### b. Legal Standard

A criminal trial of an incompetent person violates his or her federal due process rights. (*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354.) The state Constitution and section 1367 similarly preclude a mentally incompetent defendant's criminal trial or sentencing. (§ 1367, subd. (a) ["A person cannot be tried or adjudged to punishment . . . [while] mentally incompetent"]; *People v. Lightsey* (2012) 54 Cal.4th 668, 691 (*Lightsey*).) A defendant is incompetent to

10

stand trial if the defendant lacks "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [or] a rational as well as factual understanding of the proceedings against him." (*Dusky v. United States* (1960) 362 U.S. 402, 402 (*Dusky*); *Lightsey*, at p. 691 ["[s]tate constitutional authority is to the same effect" as *Dusky*].)

Under section 1368, subdivision (a), a judge must state on the record any doubt that arises in her mind as to the mental competence of the defendant, and either seek defense counsel's opinion as to the defendant's mental competency, or appoint counsel if the defendant is unrepresented. The decision whether to order a competency hearing rests within the trial court's discretion, and may be disturbed upon appeal "only where a doubt as to [mental competence] may be said to appear as a matter of law or where there is an abuse of discretion." (See *People v. Pennington* (1967) 66 Cal.2d 508, 518 (*Pennington*).) When the court is presented with "substantial evidence of present mental incompetence," however, the defendant is "entitled to a section 1368 hearing as a matter of right." (*Ibid.*) On review, our inquiry is focused not on the subjective opinion of the trial judge, but rather on whether there was substantial evidence raising a reasonable doubt concerning the defendant's competence to stand trial. (*People v. Welch* (1999) 20 Cal.4th 701, 737-738.) Evidence may be substantial even where it is contested or presented by the defense. (*Lightsey*, *supra*, 54 Cal.4th at p. 691.) A trial court reversibly errs if it fails to hold a competency hearing when one is required under the substantial evidence test. (See *ibid.*)

### c. Analysis

Defendant argues first that the trial court was obligated to hold a full competency hearing prior to trial, but failed to do so in violation of his due process rights. According to defendant, the trial court was aware of the Drukteinis

11

evaluation, and was therefore obligated to suspend proceedings and investigate whether defendant was competent to stand trial.

It is difficult to credit the argument that the trial court should have ordered a competency hearing based on the Drukteinis report, when the record does not support the conclusion that any party ever presented the report or expressly conveyed the substance of the evaluation to the court. Defendant argues that the trial court was made aware of the existence of the report when he moved to seal the report. True: the motion to seal referenced "[a]ny mention of the extradition proceedings . . . including the contents or sealing of the Drukteinis report . . . which defendant asserts was divulged in violation of his attorney-client and psychotherapist privileges." But this oblique reference to the Drukteinis report as one of eight categories of evidence does not support the inference that the trial court was made sufficiently aware of the substance of the report through the motion to seal. There is no indication in the record that either side attached the report as a sealed exhibit to the motion or to any responsive pleading. During the hearing on the motion, the parties did not discuss the specific categories of evidence, and there was no mention of the report or its contents. As the People indicated they were not seeking to introduce any of these categories of evidence, the parties and the trial court resolved the mooted motion in a cursory fashion.

Defendant's other tangential references to the Drukteinis report and to his level of competence to stand trial are similarly vague and unavailing. That defendant referenced Sisti's attempt to "lay the foundations for an Insanity Defense" in his motion for change of venue is hardly sufficient to show that the trial court knew or should have known that defendant had been subject to a preliminary evaluation by Dr. Drukteinis. Indeed, that reference arose in the context of defendant arguing that his New Hampshire counsel had made

12

"dramatic, unsubstantiated claims," which would not signal to the trial court that those claims were based on an expert evaluation.

Included among the media reports defendant submitted as exhibits in support of his change of venue motion were certain references to the contents of the Drukteinis report. A small number of these reports referenced Dr. Drukteinis's preliminary evaluation, which found that defendant's competency to stand trial and rationally participate in court proceedings was "highly questionable." It is possible that, from these exhibits, the court may have become generally aware of the report's existence and the preliminary conclusions included therein. But these articles were submitted as evidence that media publicity in Tehama County could bias jurors and prevent defendant from receiving a fair trial. Neither party drew the court's attention to these articles as providing any insight into defendant's competence or lack thereof. What mentions of the Drukteinis report were contained within exhibits spanning several hundred pages, attached to a motion unrelated to the question of defendant's competence. Those references did not constitute substantial evidence of defendant's incompetence to stand trial. So the court did not abuse its discretion in failing to hold a competency hearing based on such brief, secondhand accounts of the Drukteinis report.

In his reply brief, defendant argues for the first time that the trial court should be presumed to have acquired constructive knowledge of the contents of the Drukteinis evaluation based on the New Hampshire state court's review of the letter. Ordinarily, we do not consider arguments raised for the first time in a reply brief. (*People v. Tully* (2012) 54 Cal.4th 952, 1075.) And defendant's argument fails to persuade on the merits. Defendant cites no authority, nor have we found any, for the proposition that one state's courts may be charged with constructive knowledge of the record presented before another state's courts. Defendant relies on agency principles applied to the prosecution and police officers when a

13

criminal defendant invokes the right to remain silent. But this sheds no light on why a Tehama County trial court should be held to have knowledge of the entire record made before a New Hampshire state court in a proceeding that did not bear on the merits of the proceeding before the Tehama County court.

For substantial evidence to raise a doubt about a defendant's competence, we must be able to reasonably conclude that the evidence was in fact part of the record presented or otherwise made available to the trial court. (See, e.g., *People v. Welch*, *supra*, 20 Cal.4th at p. 738 [noting that under *Pennington*, "once the accused has come forward with *substantial evidence* of incompetence to stand trial, due process *requires* that a full competence hearing be held as a matter of right"].) We do not require a trial court to evaluate a defendant's competence based on evidence not before it at the time of its decision. (*Id.* at p. 739.) As the trial court was never presented with the Drukteinis report, and scattered references to the report within the record were brief and indirect, there is no reasonable basis to conclude that the trial court erred in failing to order a section 1368 hearing. Whether the trial court erred in failing to order a competency hearing after receiving additional information is discussed *post*.

### 2. Defense Counsel's Failure to Present the Drukteinis Report on Defendant's Competence

Defendant claims he was deprived of his Sixth Amendment right to effective assistance of counsel based on counsel's failure to inform the trial court about the substance of Dr. Drukteinis' evaluation. We reject defendant's claim as inappropriate to resolve on direct appeal.

### a. Background

Implicitly acknowledging some of the limitations of his first claim, defendant argues in the alternative that it was his counsel's ineffectiveness that gave rise to any unawareness of the Drukteinis report on the part of the trial court.

14

James Reichle represented defendant from the time of defendant's arraignment on January 30, 2003, until the time the trial court granted defendant's motion for self-representation on December 8, 2003. During that 10-month period, counsel supported defendant's motion for self-representation and further informed the court that it was counsel's opinion that there was "no . . . evidence" of defendant's incompetence to stand trial.

### b. Legal Standard

In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-692.) To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance "fell below an objective standard of reasonableness . . . under prevailing professional norms." (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. (*Ibid.*; *In re Harris* (1993) 5 Cal.4th 813, 833.)

As we have observed in the past, certain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding. (See *People v. Snow* (2003) 30 Cal.4th 43, 94-95; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268 (*Mendoza Tello*).) The record on appeal may not explain why counsel chose to act as he or she did. Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or

15

whether counsel's actions or failure to take certain actions were objectively unreasonable. (*Mendoza Tello*, at pp. 267-268.)

Moreover, we begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford "great deference to counsel's tactical decisions." (*People v. Lewis* (2001) 25 Cal.4th 610, 674.) Accordingly, we have characterized defendant's burden as "difficult to carry on direct appeal," as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had "no rational tactical purpose" for an action or omission. (*People v. Lucas* (1995) 12 Cal.4th 415, 437.)

### c. Analysis

Defendant contends that counsel's failure to present the Drukteinis report to the trial court constitutes deficient performance under prevailing professional norms. As defendant concedes, however, ineffective assistance of counsel claims are rarely successful on direct appeal because the appellate record will often not sufficiently reveal why defense counsel acted or failed to act on any given occasion. (*Mendoza Tello*, *supra*, 15 Cal.4th at pp. 267-268; *People v. Snow*, *supra*, 30 Cal.4th at pp. 94-95.)

On this record, we do not know why counsel did not bring the Drukteinis report to the trial court's attention or move for a section 1368 hearing. Indeed, the only information we have with respect to why counsel made that decision is that counsel himself did not believe that there was substantial evidence of defendant's incompetence. Counsel affirmatively supported defendant's request to represent himself. Counsel even stated on the record that he believed there was no substantial evidence of defendant's incompetence, and that defendant was competent. His reasoning may have been, for example, informed by his own

16

observations and interactions with defendant, or based on investigation not included in the appellate record. But counsel was never asked to explain his decision or the basis of his belief in defendant's competence.

Defendant cites various federal and state cases holding that counsel's failure to request a competency hearing constituted deficient performance. These cases only further demonstrate the deficiency of this record on direct appeal in revealing what information trial counsel had access to and why trial counsel made the decisions that he did. As the People note, each one of the cases relied upon by defendant involves either a habeas proceeding, a habeas proceeding consolidated with a direct appeal, a personal restraint petition, or a direct appeal involving a postconviction hearing. (See *Ford v. Bowersox* (8th Cir. 2001) 256 F.3d 783 [federal habeas corpus]; *Speedy v. Wyrich* (8th Cir. 1983) 702 F.2d 723 [federal habeas corpus]; *Kibert v. Peyton* (4th Cir. 1967) 383 F.2d 566 [federal habeas corpus]; *Loe v. United States* (E.D.Va. 1982) 545 F.Supp. 662 [federal habeas corpus]; *State v. Johnson* (Neb.Ct.App. 1996) 551 N.W.2d 742 [postconviction hearing]; *People v. Kinder* (N.Y.App.Div. 1987) 512 N.Y.S.2d 597 [postconviction hearing]; *Wilcoxson v. State* (Tenn.Ct.App. 1999) 22 S.W.3d 289 [postconviction hearing]; *In re Fleming* (Wash. 2001) 16 P.3d 610 [personal restraint petition]; *State v. Johnson* (Wis. 1986) 395 N.W.2d 176 [postconviction hearing].) Unlike the cases defendant cites, here the record is silent as to what investigation or inquiry counsel made into defendant's competence, or why counsel concluded there was no substantial evidence raising a doubt as to defendant's competence.

Defendant's argument may amount to a claim that trial counsel should be found ineffective as a matter of law for failing to request a competency hearing

regardless of whether or not there was substantial evidence raising a doubt as to competence. Yet this argument is unpersuasive. Counsel is not ineffective for failing to raise the issue of competence where there may be some evidence raising a doubt, but that evidence is not substantial. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1111-1112; cf. *People v. Lewis* (2006) 39 Cal.4th 970, 1047 ["Evidence is not substantial enough to mandate a mental competence hearing unless it raises a reasonable doubt on the issue"].)

The record does not reveal why counsel chose not to pursue a section 1368 hearing or otherwise present the Drukteinis report to the trial court. As defendant has failed to show affirmative evidence that counsel could have had "no rational tactical purpose" for these decisions, defendant has not demonstrated constitutionally deficient performance on this record. (See *People v. Lucas*, *supra*, 12 Cal.4th at p. 437.) Under these circumstances, it would be inappropriate for us to address defendant's ineffectiveness claim on direct appeal. (See *People v. Lewis*, *supra*, 25 Cal.4th at pp. 674-675.)

### 3. Failure to Suspend Proceedings Prior to Judgment

In addition to claiming that the trial court had substantial evidence of defendant's incompetence prior to trial, defendant contends that the trial court became aware of additional evidence of his incompetence after the preliminary hearing, requiring the trial court to suspend proceedings and hold a competency hearing. Defendant argues that the trial court's failure to do so violated his due process rights. For the reasons discussed below, defendant's claim fails.

#### a. Background

At the guilt phase, defendant was precluded from presenting his legally invalid "liberty defense" to first degree murder. In response to the trial court's order preventing him from presenting the defense of liberty as a justification of

18

murder, the trial court observed that defendant became "very emotional" as he responded that he would "sit in silent protest during the guilt phase and . . . not speak or raise any issues until the penalty phase." While defendant cross-examined several prosecution witnesses and gave both an opening and closing statement, he did not otherwise put on a defense during the guilt phase. At the penalty phase, defendant testified to explain that his actions were motivated by a sense of patriotism, and that he had consequently killed Officer Mobilio in order to defend constitutionally guaranteed liberties that he believed the government was infringing.

On April 27, 2005, after the jury had returned the guilt and penalty verdicts, the trial court conducted proceedings on the automatic motion to modify the judgment under section 190.4. (§ 190.4, subd. (e).) The trial court denied the motion in a written statement of reasons. In denying the section 190.4 motion, the trial court declined to consider letters from defendant's family and friends or the probation report because the trial court believed it was only entitled to review evidence presented to the jury. After issuing its decision on the section 190.4 motion, the trial court read the letters and probation report.

Defendant's mother, Karen Mickel, submitted a character reference letter for her son. In her letter, defendant's mother expressed her belief that defendant had "a mental illness" and referred to reports by "two psychiatrists" who had apparently assessed defendant after he killed Officer Mobilio. One psychiatrist had given Karen a "verbal diagnosis" that defendant "suffered from a psychosis." A second psychiatrist came to a similar conclusion, but did so "[b]efore the entire assessment was completed," and informed Karen that "he needed more time to be able to completely delineate the exact form." Defendant's father, Stanley Mickel, also submitted a letter describing defendant's "growing mental illness." Other letters from defendant's friends and family described defendant as "crazy," "very

19

sick," "very confused and disturbed," and referenced defendant's prior treatment by psychologists.

### b. Legal Standard

Section 190.4, subdivision (e), provides for an automatic application to modify the verdict in every case in which the jury has returned a verdict imposing death. In ruling on such a motion, the trial court must independently reweigh the evidence of aggravating and mitigating circumstances, and exercise its independent judgment to determine whether the weight of the evidence supports the jury's verdict. (*People v. Cunningham* (2015) 61 Cal.4th 609, 669.)

As noted above, section 1368, subdivision (a) provides, in relevant part, that "[i]f, during the pendency of an action and prior to judgment . . . a doubt arises in the mind of the judge as to the mental competence of the defendant," the trial court must suspend proceedings to determine the defendant's competence. (*Pennington*, *supra*, 66 Cal.2d at p. 521.) A defendant is incompetent to stand trial if the defendant lacks "sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding . . . [or] a rational as well as factual understanding of the proceedings against him [or her]." (*Dusky*, *supra*, 362 U.S. at p. 402.) Because the decision whether to order a competency hearing "is for the discretion of the trial judge," we will not reverse it on appeal unless "a doubt as to [mental competence] may be said to appear as a matter of law or where there is an abuse of discretion." (*Pennington*, at p. 518.) Only where the court is presented with substantial evidence of mental incompetence is a defendant "entitled to a section 1368 hearing as a matter of right." (*Ibid.*)

### c. Analysis

In deciding defendant's automatic motion to modify the verdict under section 190.4, the trial court limited its review to evidence actually presented —

and it was right to do so. (*People v. Lewis* (2004) 33 Cal.4th 214, 230 [" '[T]he court may review only evidence that was presented to the jury' " in § 190.4, subd. (e) hearing]; *People v. Cooper* (1991) 53 Cal.3d 771, 849 [trial court correctly declined to hear statements by victims' relatives before ruling on modification motion].) The trial court therefore properly refused to consider the letters submitted by defendant's friends and family in advance of deciding the automatic motion to modify the judgment.

Defendant contends, however, that the trial court's failure to consider the letters from defendant's family members and friends also violated his due process rights. The due process violation, he claims, occurred because these letters provided additional evidence of defendant's incompetence, which required the court to suspend proceedings at that point. Defendant's friends and family sought leniency for defendant, and described him as "crazy" and "very disturbed."

To raise a doubt under the substantial evidence test, we require more than "mere bizarre actions" or statements, or even expert testimony that a defendant is psychopathic, homicidal, or a danger to him- or herself and others. (*People v. Laudermilk* (1967) 67 Cal.2d 272, 285 (*Laudermilk*); *People v. Jensen* (1954) 43 Cal.2d 572, 579.) Rather, the focus of the competence inquiry is on a defendant's understanding of the criminal proceedings against him or her and the ability to consult with counsel or otherwise assist in his or her defense. (See *Dusky*, *supra*, 362 U.S. at p. 402.) Defendant's trial demeanor is relevant to, but not dispositive of, the question whether the trial court should have suspended proceedings under section 1368. (See *Pate v. Robinson* (1966) 383 U.S. 375, 386 ["While Robinson's demeanor at trial might be relevant to the ultimate decision as to his [competence to stand trial], it cannot be relied upon to dispense with a hearing on that very issue"].) In assessing whether the trial court erred in failing to suspend

21

proceedings, we consider all evidence related to defendant's competence of which the trial court had become aware before it entered judgment.

The court was indeed informed of evidence demonstrating defendant's erratic behavior. The motion for change of venue stated that former counsel Sisti had attempted "to lay the foundations for an Insanity Defense" before the New Hampshire state court, though defendant himself characterized Sisti's claims about his competence as "dramatic" and "unsubstantiated." In a filing concerning whether defendant should be physically restrained during proceedings, the People referenced defendant's uncooperativeness during his incarceration in New Hampshire, including the fact that he refused to dress and chose to cover himself with a blanket to make a court appearance via closed circuit monitor. Defendant sought to justify the killing of Officer Mobilio as a "necessary" exercise of his "right to defend liberty" and attempted to claim corporate immunity based on his decision to register as a corporation. When the court decided that defendant could not present his liberty justification, defendant became "very emotional" and opted, "in protest," not to present any evidence for his case during the guilt phase. Defendant's bizarre behavior and his unconventional trial demeanor pertain to his competence, but they are not dispositive.

The record of trial proceedings shows that defendant understood the nature and purpose of the proceedings and was capable of assisting in his own defense. Defendant submitted well-researched legal briefs, argued motions, and cross-examined witnesses. A few months after his initial appearance in court, defendant represented that he had "undertaken extensive and diligent study to become more familiar with the criminal trial process." Defendant later filed a 15-page memorandum of points and authorities in support of his request for self-representation, where he cited relevant legal authority and made logical

arguments. There is also no evidence in the record that defendant failed to cooperate with Reichle while he served as defense counsel or as advisory counsel.

And the letters and probation report, read by the court after a verdict was rendered, do not provide further evidence raising a doubt as to competence. The letters from family and friends claimed, among other things, that defendant had been assessed by psychiatrists, and he was "crazy" or "very confused and disturbed." Revealing though these letters might be of the extent of concern among defendant's family or friends, they convey little about defendant's competence to stand trial. Such letters did not speak to defendant's ability to understand the proceedings or assist in his defense. At best, these letters reflect generalized concerns that defendant suffered from depression or a psychosis, but they do not show that defendant was, as a result of his mental illness, unable to understand the nature and purpose of the criminal proceedings against him or conduct his defense. (See *Laudermilk*, *supra*, 67 Cal.2d at p. 285; see also *People v. Halvorsen* (2007) 42 Cal.4th 379, 403 [statements by expert that defendant suffered from mental illness and exhibited erratic and psychotic behavior not substantial evidence of incompetence]; *People v. Blair* (2005) 36 Cal.4th 686, 714 (*Blair*) ["even a history of serious mental illness does not necessarily constitute substantial evidence of incompetence that would require a court to declare a doubt"].) Defendant relies on references to a "verbal diagnosis" of a psychosis and an incomplete assessment reaching a similar conclusion by two psychiatrists in his mother's letter but, again, those claims offer little insight into whether defendant lacked the ability to understand the proceedings against him or otherwise participate in and conduct his defense. (See *Laudermilk*, at p. 282.) Nor does the probation report support defendant's argument. That report concludes that "[n]othing in [defendant's] background suggests a serious moral or emotional

weakness of character. There is no indication of instability; he speaks with utter clarity about what he did and why."

The evidence before the trial court, in short, did not amount to substantial evidence requiring the court to suspend proceedings prior to entering judgment. Because of this, we cannot conclude that the court abused its discretion by failing to declare a doubt as to defendant's competence and order a hearing. We therefore reject defendant's claim.

### 4. Deprivation of the Right to Counsel

Defendant argues that the trial court erred in allowing him to waive his constitutional right to counsel because defendant was incompetent to do so. More specifically, defendant contends that under *Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*), California may impose requirements beyond *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*), and that California has done so. For the reasons discussed below, we reject defendant's claim.

### a. Background

Defendant expressed his desire to represent himself during his first appearance in the trial court. After being informed that his acceptance of counsel's representation during the preliminary hearing would not constitute waiver of his right to represent himself during trial, defendant accepted representation on February 4, 2003.

On April 7, 2003, counsel filed a motion requesting an opportunity for defendant to personally address the court during the preliminary hearing and explain the "legal basis and nature of his affirmative defense." Following a response by the People, the court held a hearing on the motion. During the hearing, defense counsel explained that while defendant "admitted [to] doing the act," defendant wanted an opportunity to justify his action of killing Officer

Mobilio. Defense counsel explained that there was "obviously no case or jury instruction for a justification in this case," but that defendant wished to explain his actions to the court during the preliminary hearing. The trial court denied the motion, citing the potentially prejudicial publicity and absence of any entitlement to put forth such a justification during the preliminary hearing.

On November 20, 2003, defendant, through counsel, filed a motion seeking self-representation. Defendant personally prepared a memorandum of points and authorities in support of his motion. Citing relevant legal authority, defendant requested that he be allowed to represent himself and that Reichle be appointed as advisory counsel. Reichle also filed a brief in support of defendant's motion. The People's response did not oppose defendant's request for self-representation, but argued that defendant's demonstrated legal capabilities obviated the need for advisory counsel.[3] At the hearing on the motion, the trial court engaged in a *Faretta* colloquy with defendant. The court verified that defendant had read, understood, and signed the written *Faretta* waiver. It then concluded on the record that defendant had knowingly and intelligently waived his right to counsel. The court granted defendant's motion and appointed Reichle as advisory counsel.

### b. Legal Standard

A defendant has a federal constitutional right to the assistance of counsel during all critical stages of a criminal prosecution. (*Faretta*, *supra*, 422 U.S. at p. 807; *United States v. Wade* (1967) 388 U.S. 218, 223-227.) A defendant may also waive this right and personally represent him- or herself, so long as the defendant's waiver of the right to counsel is valid. A valid waiver requires that the

---

[3] Notwithstanding the People's position in their response, the prosecution did argue in favor of appointing standby counsel.

defendant possess the mental capacity to comprehend the nature and object of the proceedings against him or her, and that the defendant waive the right knowingly and voluntarily. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1069 (*Koontz*).) If a defendant has validly waived the right to counsel, a trial court must grant a defendant's request for self-representation. (*People v. Welch*, *supra*, 20 Cal.4th at p. 729.) We review a *Faretta* waiver de novo, and examine the entire record to determine the validity of a defendant's waiver of the right to counsel. (*Koontz*, at p. 1070.)

### c. Analysis

Defendant argues the trial court erred in permitting him to represent himself without determining whether defendant was sufficiently competent to conduct his own defense. According to defendant, the evolution of California and federal case law on the intersection of competence and the right of self-representation requires that California courts apply the highest standards of competence consistent with federal law, i.e., that a defendant understand "the nature of the charges and the available defenses."

We begin with established principles. There is no dispute that the right of self-representation is not absolute. (*Edwards*, *supra*, 554 U.S. at p. 171.) The autonomy and dignity interests underlying our willingness to recognize the right of self-representation may be outweighed, on occasion, by countervailing considerations of justice and the state's interest in efficiency. (See, e.g., *ibid.*; *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.* (2000) 528 U.S. 152, 163 [no right of self-representation on direct appeal]; *McKaskle v. Wiggins* (1984) 465 U.S. 168, 178-179 [appointment of standby counsel against defendant's wishes is permissible].) What we have declined to find is that a defendant's autonomy and dignity interests are outweighed as a matter of law whenever the

26

criminal trial happens to be a capital one.  (*People v. Taylor* (2009) 47 Cal.4th 850, 865 (*Taylor*).)  This is so even where a self-represented defendant chooses a strategy seeking death rather than life imprisonment without the possibility of parole, as an individual could rationally prefer the death penalty.  (*Ibid.*)  We have also rejected claims that the fact or likelihood that an unskilled, self-represented defendant will perform poorly in conducting his or her own defense must defeat the *Faretta* right.

Accordingly, the critical question is not whether a self-represented defendant meets the standards of an attorney, or even whether a defendant is capable of conducting an effective defense.  Instead, we have accepted that the cost of recognizing a criminal defendant's right to self-representation may result " 'in detriment to the defendant, if not outright unfairness.' "  (*Taylor*, *supra*, 47 Cal.4th at p. 866, quoting *Blair*, *supra*, 36 Cal.4th at p. 739.)  But that is a cost that we allow defendants the choice of paying, if they can do so knowingly and voluntarily.

Both the high court and this court have further elucidated the limitations that competence may impose on the scope of the self-representation right.  Until the high court's decision in *Edwards*, California courts had generally held that the standards for competence to stand trial and competence to represent oneself were identical.  (See *Taylor*, *supra*, 47 Cal.4th at p. 874.)  In *Edwards*, the high court addressed "gray-area defendants," i.e., those defendants who satisfy the *Dusky* standard for competence to stand trial, but because of severe mental illness are not capable of conducting trial proceedings on their own.  (*Edwards*, *supra*, 554 U.S. at pp. 175-176 ["an individual may well be able to satisfy *Dusky*'s mental competence standard, for he will be able to work with counsel at trial, yet at the same time . . . may be unable to carry out the basic tasks needed to present [a] defense without the help of counsel"].)  While the high court had previously held

27

that a state may permit a gray-area defendant to represent him- or herself (see *Godinez v. Moran* (1993) 509 U.S. 389, 402), it was not until *Edwards* that the high court clarified that a state may also limit a defendant's right to self-representation by requiring more than mere competency to stand trial (*Edwards*, at p. 174).  The *Edwards* court declined to adopt a more specific standard for determining a defendant's competency to represent him- or herself.  (*Id.* at p. 178.)

Taking up the question *Edwards* left unresolved, we held in *Johnson* that — consistent with California law — trial courts may deny self-representation as permitted under *Edwards*.  (*People v. Johnson* (2012) 53 Cal.4th 519, 528 (*Johnson*).)  As did the high court, we declined to adopt a more specific standard for competency in the self-representation context, and instead concluded that the appropriate standard is "whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Id.* at p. 530.)  In adopting the *Edwards* formulation, we rejected calls to adopt more specific standards articulated by the People, various amici curiae, lower court decisions, and law review articles.[4]  (*Id.*

---

[4]   "The Attorney General suggest[ed] the 'standard could be as simple as determining whether the defendant can conceive of a defense and coherently communicate it to the judge and jury.' " (*Johnson*, *supra*, 53 Cal.4th at p. 529.)  Some amici curiae suggested we "return to . . . the pre-*Faretta* standard in California 'requiring that a defendant who wishes to represent himself demonstrate an understanding of the charges, defenses and punishments, and an ability to rationally communicate.' " (*Ibid.*)

Still others called for adoption of the test for " 'cognitive and communicative skills,' " first articulated in *People v. Burnett* (1987) 188 Cal.App.3d 1314 and repeated in *Taylor*, which looked at whether a defendant: " ' "(1) possesses a reasonably accurate awareness of his [or her] situation, including not simply an appreciation of the charges against him [or her] and the range and nature of possible penalties, but also his [or her] own physical or mental infirmities, if any; (2) is able to understand and use relevant information rationally in order to fashion a response to the charges; and (3) can coherently communicate

*(footnote continued on next page)*

28

at p. 529.) While other, more specific standards were plausible, we reaffirmed the basic principle articulated in *Edwards*: state courts may only exercise the discretion to deny self-representation based on a defendant's mental state as permitted under *Edwards*. (*Id.* at 530.)

Here, defendant argues once more that we should adopt a more specific standard for competence to waive the right to counsel. Defendant observes that our pre-*Faretta* case law required that a defendant not only understand the nature of the criminal proceedings against him or her, but also the nature of the charge, the elements of the offense, the available pleas and defenses, and the range of possible punishments. (*In re Johnson* (1976) 62 Cal.2d 325, 335.) True, but our pre-*Faretta* case law cannot be indiscriminately imported into a post-*Faretta* world. As we concluded in *Johnson*, California courts may only exercise the discretion permitted under *Edwards*, not the discretion our pre-*Faretta* case law reflected. (*Johnson*, *supra*, 53 Cal.4th at p. 530.) We came to that conclusion while rejecting suggestions that we adopt the very same standard which defendant now advocates. (*Id.* at pp. 529-530.) Under *Edwards*, a trial court may exercise its discretion to deny self-representation where a defendant suffers from a severe mental illness such that he or she is unable to perform the basic tasks necessary to present a defense. (*Johnson*, at p. 530; *Edwards*, *supra*, 554 U.S. at pp. 175-176.)

---

*(footnote continued from previous page)*

that response to the trier of fact." [Citation.]' " (*Johnson*, *supra*, 53 Cal.4th at p. 529, quoting *Taylor*, *supra*, 47 Cal.4th at p. 873.) Contrary to defendant's argument, we noted that while trial courts and experts may consider these factors, we did not hold that trial courts must consider these factors in exercising their discretion to deny self-representation. (*Johnson*, at p. 530.)

What defendant contends here is that there was substantial evidence that he was incapable of presenting a defense without the assistance of counsel. Defendant cites the Drukteinis report, his theory concerning his liberty justification, and his emotional reaction to the trial court's exclusion of the defense as sufficient indicia of defendant's incompetence to require the trial court to deny defendant's request for self-representation. But a trial court is not required to "routinely inquire" into a defendant's mental competence when evaluating a *Faretta* motion. (*Johnson*, *supra*, 53 Cal.4th at pp. 530-531.) Indeed, a trial court need only do so where it has doubts about the defendant's competence, and for the reasons discussed *ante*, the trial court here had little reason to doubt defendant's mental competence.

In the instant case, the record reflects that defendant demonstrated his capability to undertake the basic tasks necessary to represent himself, and that the trial court had no reason to doubt defendant's skill and ability to do so. Defendant was cooperative, respectful, and articulate during courtroom proceedings. He filed motions citing relevant legal authority that he applied to the specific facts at hand, made organized and internally consistent arguments, and was able to effectively communicate his arguments to the trial court in written and oral form. Defendant demonstrated the ability to understand courtroom proceedings and apply rules of procedure. During the pretrial and trial proceedings, defendant moved for and won a motion to change venue, challenged two jurors for cause after engaging in voir dire, exercised a peremptory challenge, gave opening and closing statements, and cross-examined witnesses. There is ample evidence throughout the record that defendant was capable of undertaking the types of basic trial tasks the high court identified as relevant to the competence inquiry. (*Edwards*, *supra*, 554 U.S. at pp. 175-176, citing *McKaskle v. Wiggins*, *supra*, 465 U.S. at p. 174 ["basic tasks" include "organization of defense, making motions, arguing points of law,

30

participating in voir dire, questioning witnesses, and addressing the court and jury"].)

The trial judge had the benefit of observing and interacting with defendant. The court indicated on multiple occasions that it was extremely impressed with defendant's competence and skill in representing himself and that defendant was "very articulate, [and] very well prepared." And while the trial court correctly concluded that defendant's political theories could not serve as a valid legal defense, the mere fact that defendant held fringe political beliefs that inspired his murder of a police officer does not render him incompetent to represent himself. And defendant's decision to present no defense — though ill-advised — was a valid exercise of his right to control his defense. (See *People v. Clark* (1990) 50 Cal.3d 583, 617 ["The defendant has the right to present no defense and to take the stand and both confess guilt and request imposition of the death penalty"].)

In sum, defendant's conduct demonstrated he was capable of performing the basic tasks of self-representation. We reject defendant's claim that the trial court erroneously deprived him of his Sixth Amendment right to counsel.

### 5. *Violation of Penal Code Section 686.1*

Defendant argues that the trial court erred under section 686.1 by failing to revoke his self-representation during the penalty phase. We conclude there was no error.

Section 686.1 requires defendants in capital cases to be represented by counsel during all stages of the preliminary and trial proceedings. This provision predates the high court's decision in *Faretta* and may only be applied where *Faretta* is not implicated. (*Johnson*, *supra*, 53 Cal.4th at p. 526 [explaining that post-*Faretta*, "Penal Code section 686.1 . . . cannot be given effect," but that California courts should "give effect to this California law" when possible]; see

*People v. Burgener* (2016) 1 Cal.5th 461, 474-475 (*Burgener II*).  As defendant concedes, a capital defendant's right to self-representation may not be limited at the penalty phase.  Indeed, the penalty phase is merely another stage in a unitary capital trial, and the Sixth Amendment right to counsel and corresponding right to self-representation is not vitiated during the penalty phase.  (*Blair*, *supra*, 36 Cal.4th at pp. 737-738.)  We have also considered and rejected defendant's argument that there is any diminution of a criminal defendant's autonomy interests during the penalty phase.  (*Id.* at p. 738; see *Taylor*, *supra*, 47 Cal.4th at p. 865 ["the autonomy interest motivating the decision in *Faretta* . . . applies at a capital penalty trial as well as in a trial of guilt"].)  Indeed, we have concluded that a defendant continues to have "an interest in personally presenting his or her defense" at the penalty phase and controlling what, if any, mitigating evidence to present.  (*Blair*, at p. 738.)

Notwithstanding this contrary precedent, defendant argues that these cases do not reflect the high court's holding in *Edwards* that states may limit the right to self-representation for gray-area defendants.  Defendant is correct that *Edwards* stands for the proposition that California may, consistent with the federal Constitution, limit a criminal defendant's self-representation right where a defendant lacks the mental capacity to conduct his or her defense.  That does not, however, support the broad conclusion that the right to self-representation is abrogated during the penalty phase.  (See *Edwards*, *supra*, 554 U.S. at pp. 174-175.)  Contrary to defendant's argument, we find nothing in *Edwards* that requires us to conclude that a state's interest in the integrity of death judgments may trump a defendant's autonomy interests merely because the trial has proceeded to the sentencing stage.  Indeed, we rejected such an argument in *Taylor*, a post-*Edwards* decision, in which we held that the autonomy interests underlying *Faretta* apply

32

with equal force at the penalty phase of a capital trial as at the guilt phase. (*Taylor*, *supra*, 47 Cal.4th at p. 865.)

To the extent defendant's argument relies on the same claims addressed in the prior section, we again conclude that the trial court did not err in failing to sua sponte revoke defendant's self-representation. For the reasons stated above, the trial court had little reason to question defendant's ability to carry out the basic tasks of self-representation.

### 6. *Failure to Obtain a Renewed* Faretta *Waiver*

The People filed a section 190.3 notice of intent to seek death after the trial court granted defendant's motion for self-representation. Defendant contends that the trial court erred in failing to obtain an updated *Faretta* waiver after the People filed their section 190.3 notice. As the record supports the conclusion that defendant was fully aware that the People sought the death penalty before the trial court granted defendant's motion for self-representation, we conclude that defendant's *Faretta* waiver was knowing and voluntary.

### a. Background

Defendant expressed his desire to represent himself during his first appearance in the trial court on January 30, 2003. After being represented by counsel through the preliminary hearing, defendant filed a motion requesting self-representation on November 20, 2003. Defendant personally prepared a memorandum of points and authorities in support of his motion. At the hearing on the motion, the trial court informed defendant that he had a right to be represented by counsel, and warned defendant about the disadvantages of self-representation, including that the prosecutor would be an experienced and skilled attorney and that the court would be unable to assist defendant. The trial court further explained that defendant would be unable to make an ineffective assistance of

33

counsel claim with respect to his self-representation and gave defense counsel and the prosecutor an opportunity to be heard on the motion. The prosecutor stated the People's preference that standby counsel be appointed to take over if the court terminated defendant's self-representation but otherwise submitted on the motion. Defendant disagreed with the prosecutor's description of the limited role of standby counsel. He cited state and federal case law for the proposition that standby counsel could provide assistance throughout the proceedings when requested by the defendant and allowed by the court. After the trial court explained that Reichle would be only an "advisor" to defendant, and that defendant would be responsible for presenting his own defense, the trial court asked whether defendant understood that "[i]f you are taking on the responsibility of self-representation, you are taking on all of it, and must assume that you are going to have to handle that case on your own." Based on defendant's affirmative response, the trial court concluded on the record that defendant had knowingly and intelligently waived his right to counsel. The court granted defendant's motion and appointed Reichle as advisory counsel. Defendant then entered a plea of not guilty and denied the special circumstance.

At a status conference on February 9, 2004, the prosecutor indicated that he "would just like to state on the record that this will be a death penalty case," and that the prosecutor had "let Mr. Reichle know that before." The trial court asked whether defendant or Reichle had anything further to discuss, they answered in the negative, and the hearing ended.

### b. Legal Standard

A criminal defendant may waive his or her right to counsel under the Sixth Amendment to the United States Constitution. A valid waiver requires that the defendant have "the mental capacity to understand the nature and object of the

34

proceedings against him or her," and that the defendant waives the right knowingly and voluntarily. (*Koontz*, *supra*, 27 Cal.4th at pp. 1069-1070.) In deciding whether a waiver is knowing and voluntary, we examine the record as a whole to see whether the defendant actually understood the consequences and import of the decision to waive counsel, and whether the waiver was freely made. (*Godinez v. Moran*, *supra*, 509 U.S. at p. 401, fn. 12.) There is no prescribed script or admonition that trial courts must use in warning a defendant of the disadvantages of self-representation. But, in whatever way the trial court chooses to explain the perils of self-representation, the record as a whole must establish that the defendant understood the "dangers and disadvantages" of waiving the right to counsel, including the risks and intricacies of the case. (*Blair*, *supra*, 36 Cal.4th at p. 708; *People v. Burgener* (2009) 46 Cal.4th 231, 241 (*Burgener I*).) We review a *Faretta* waiver de novo, and examine the whole record to determine the validity of a defendant's waiver of the right to counsel. (*Burgener I*, at p. 241.)

### c. Analysis

Defendant argues that the trial court should have obtained an updated *Faretta* waiver when the People formally put on the record their intention to seek the death penalty. Pivotal to defendant's claim is the assumption that defendant failed to apprehend that the People intended to seek the death penalty at the time he filed his motion for self-representation.

The record shows otherwise. As the People note, the criminal information filed on May 29, 2003, charged defendant with one count of murder and the special circumstance that the victim was a peace officer engaged in the performance of his duties. The information also specified that the sentencing range was life without parole or death. Defendant also concedes that he filed a *Faretta* waiver form, which states that the defendant had been advised of "the

35

penalties for the offense[s] if found guilty and additional consequences that could result." In response to the court's queries at the hearing on defendant's motion for self-representation, defendant stated that he had read and understood the form and did not have any questions.

Defendant dismisses the importance of the waiver form and the questioning by the trial court. Instead, defendant contends, there is no evidence in the record that the trial court ever explicitly advised defendant that death was a possible penalty before granting his motion for self-representation. Defendant is right that the record does not indicate clearly whether the trial court so advised defendant. While many defendants will know the potential sentences they face while waiving representation, it is valuable for trial courts — as a routine practice — to orally review during a *Faretta* colloquy the potential sentence a defendant faces.

What is nonetheless clear from this record is that, one way or another, defendant was fully aware of the fact that this was a capital case at the time he requested to represent himself. In defendant's November 24, 2003, memorandum of points and authorities in support of his motion for self-representation, defendant referred to the capital nature of the case multiple times throughout the 15-page document. Defendant specifically requested that the court appoint Reichle as advisory counsel, and in citing legal authority setting forth the scope of the trial court's discretion to do so, argued that, "In capital cases the Court has the authority to appoint an additional attorney as co-counsel. P.C. 987(d)." On the next page, defendant cited section 987, subdivision (d) and case law for the proposition that "[i]n a death penalty case a trial court may be required to appoint a second attorney as co-counsel." Defendant acknowledged that "apparently a defendant representing himself in a death penalty case is not recognized to have this same right to the appointment of second counsel," but then put forth an argument that the same standard for appointing second counsel should apply to pro

36

se capital defendants. Defendant also argued that his planned defense was an "extremely complex" one that required the assistance of "death-qualified counsel." There is little doubt that defendant comprehended that this was a capital case at the time the trial court accepted his *Faretta* waiver.

The People's response to defendant's motion for self-representation also referred to the case, repeatedly, as a capital one. Defendant disagreed with the People's response to his motion at the hearing and demonstrated that he had both read and understood the nuances of the People's brief. These facts support the conclusion that defendant was both advised and fully aware of the fact that he would be facing the death penalty at the time he waived his right to counsel. That the People did not give their section 190.3 notice until February 9, 2004, is of little import where, as here, the record as a whole reflects that defendant knew and understood that he would be facing the death penalty. Accordingly, we reject defendant's claim.

### B. Guilt Phase Issues

*1.* Witt *Issues as to Jurors Nos. 7877, 7017, 10155, and 9466*

According to the defendant, the written questionnaires of four seated jurors indicated that these jurors believed a defendant convicted of killing a police officer engaged in the performance of his or her own duties should automatically receive the death penalty. Defendant contends that these jurors therefore should have been excused for cause under *Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*). Defendant argues that the trial court violated his rights to an impartial jury under the Sixth Amendment to the United States Constitution. Defendant's claim is forfeited and, even if not forfeited, meritless.

37

### a. Background

The trial court, with the input of the parties, required prospective jurors to fill out a written questionnaire prior to voir dire. The questionnaire included several questions intended to elicit prospective jurors' views on the death penalty, and whether a prospective juror would be capable of setting aside his or her own personal beliefs and defer to the law. Questions Nos. 38 and 54 sought to determine whether a prospective juror would always vote for death if a defendant was found guilty of intentional first degree murder, and whether a prospective juror could see him- or herself exercising both sentencing options.[5] Similarly, question No. 55 asked prospective jurors whether they strongly agreed, somewhat agreed, strongly disagreed, or somewhat disagreed with the statement that "[a]nyone who intentionally kills another person should always get the death penalty."

In addition, questions Nos. 39 and 49 asked prospective jurors for their opinions about capital punishment under the facts presented in the case at hand: the killing of a police officer while the officer was engaged in the performance of his duties. More specifically, question No. 39 asked: "Do you feel that the State of

---

[5]    Question No. 38 asked: "If the jury found a defendant guilty of intentional first degree murder and found a special circumstance to be true, would you always vote for death, no matter what other evidence might be presented at the penalty hearing in this case?"

Question No. 54 asked: "There are no circumstances under which a jury is instructed by the court to return a verdict of death. No matter what the evidence shows, the jury is always given the option in the penalty phase of choosing life without the possibility of parole. (a) Given the fact that you will have two options available to you, can you see yourself, in the appropriate case, rejecting the death penalty and choosing life imprisonment without the possibility of parole instead? (b) Given the fact that you will have two options available to you, can you see yourself, in the appropriate case, rejecting life imprisonment without the possibility of parole and choosing the death penalty instead?"

California should automatically put to death everyone who: A. Kills another human being? B. Is convicted of murder? C. Is convicted of multiple murder? D. Is convicted of murder plus the murder was of a peace officer while the peace officer was engaged in the performance of his duties?" Question No. 49 queried: "The murder alleged in this case alleges the special circumstances that David Mobilio was a police officer who was intentionally killed while engaged in the performance of his duties and that the defendant knew and reasonably should have known that David Mobilio was a peace officer who was engaged in the performance of his duties. Do you think that, depending on the circumstances of this case and the evidence to be presented in the penalty phase, if any: -- you could impose the death penalty in such case? -- you could impose life in prison without parole in such a case?"

During voir dire, the trial court asked prospective jurors additional questions. The court inquired as to the prospective jurors' views on the death penalty, their ability to impose either life without the possibility of parole or the death penalty based on the evidence, and their willingness to be fair and impartial and follow the court's instructions. The trial court asked each prospective juror these questions on the record, and also asked follow-up questions if the prospective juror's questionnaire responses indicated potential bias or revealed any inconsistencies or ambiguities. After the trial court questioned prospective jurors on death qualifications, defendant and the prosecution stipulated to the excusal of two prospective jurors, and the parties were allowed to conduct their own voir dire.

Defendant challenged two prospective jurors for cause. The prosecution submitted as to the first juror and objected to the second. The trial court excused the first juror, but denied defendant's challenge as to the second juror. Defendant subsequently exercised a peremptory strike as to the second juror. Defendant also

39

struck another prospective juror.  Defendant then passed on the remainder of his peremptory challenges.

### b.  Legal Standard

A criminal defendant is entitled to an impartial jury.  (*People v. Earp* (1999) 20 Cal.4th 826, 852.)  A prospective juror's opinions on the death penalty may support an excusal for cause if those opinions would " 'prevent or substantially impair the performance' " of the prospective juror's duties.  (*Witt, supra*, 469 U.S. at p. 424.)  A prospective juror who is incapable of "conscientiously consider[ing]" the full range of sentencing options, including the death penalty, should be excluded from service.  (*People v. Jenkins* (2000) 22 Cal.4th 900, 987 (*Jenkins*).)  An inability to carefully and sincerely consider all sentencing options is distinct, however, from merely holding views about the death penalty, including personal opposition to capital punishment.  (*People v. Leon* (2015) 61 Cal.4th 569, 591 (*Leon*) ["But personal opposition to the death penalty is not an automatic ground for excusal"].)  Rather, so long as a prospective juror is willing to " 'temporarily set aside [his or her] own beliefs' " and fairly consider the sentencing alternatives presented under the law, the prospective juror may properly serve on a capital jury.  (*Id.* at p. 592; *Lockhart v. McCree* (1986) 476 U.S. 162, 176.)

Where a trial court conducts in-person voir dire, we generally defer to the trial court's determination as to a prospective juror's true state of mind.  (*Leon, supra*, 61 Cal.4th at p. 593; *Jenkins, supra*, 22 Cal.4th at p. 987.)  Unlike the reviewing court, the trial court that has conducted voir dire has the unique benefit of observing a prospective juror's credibility, tone, attitude, and demeanor — factors we have described as of " ' "critical importance" ' " in determining

40

whether a prospective juror is capable of performing his or her duties as a juror. (*Leon*, at p. 593.)

### c. Analysis

Defendant has forfeited any *Witt* claim. As a general matter, we require a defendant to exhaust his or her peremptory challenges as a condition precedent to a claim of error in this context. (*People v. Bolin* (1998) 18 Cal.4th 297, 315.) A defendant must (1) use a peremptory challenge to remove the objected-to juror, (2) exhaust his or her peremptory challenges or provide a justification for the failure to do so, and (3) "express dissatisfaction" with the selected jury. (*Blair*, *supra*, 36 Cal.4th at p. 741; *Taylor*, *supra*, 47 Cal.4th at p. 884 [quoting *Blair*].)

Here, defendant concedes that he failed to use his peremptory challenges with respect to Jurors Nos. 7877, 7017, 10155, and 9466, that he did not exhaust his peremptory challenges, and that he did not express dissatisfaction with the final jury. Defendant provides no justification for his failure to challenge or object to these jurors, and we find no reason in the record why defendant could not have done so. Indeed, as noted, defendant challenged other jurors for cause and exercised a peremptory strike as to the juror that the trial court did not excuse for cause. Defendant has forfeited any claim of error with respect to Jurors Nos. 7877, 7017, 10155, and 9466.

Moreover, even assuming defendant had not forfeited his claims with respect to Jurors Nos. 7877, 7017, 10155, and 9466, those claims lack merit. Defendant argues that the four jurors' responses to the questionnaire were subject to challenge for cause, as their opinions would prevent or substantially impair their performance of their duties as jurors. Specifically, Jurors Nos. 7877, 7017, and 10155 all responded "yes" to question No. 39-d, which asked whether the individual felt that the state should automatically put to death everyone who "[i]s

41

convicted of murder plus the murder was of a peace officer while the peace officer was engaged in the performance of his duties." Juror No. 9466 responded to this question with a question mark. As the People observe, however, each of these jurors also answered a series of other questions on the written questionnaire, including providing affirmative responses to question No. 49, which asked each juror whether "you could impose" the death penalty or life in prison without parole, after describing the specific facts of this case: that defendant had allegedly killed a peace officer who was engaged in the performance of his duties.

It is conceivable that these jurors held the personal opinion that the state should automatically impose the death penalty whenever a defendant is found guilty of the intentional murder of a peace officer engaged in the performance of his or her duties. But each of these four jurors also affirmatively stated that he or she was capable of imposing *either* the death penalty or life in prison without parole under the specific facts presented in the instant case. That they had particular feelings and opinions about the propriety of capital punishment for the killing of peace officers is, standing alone, insufficient to require excusal from service. (See *Leon*, *supra*, 61 Cal.4th at p. 592; *Jenkins*, *supra*, 22 Cal.4th at p. 987.) Instead, we ask whether the record reflects the jurors' ability and willingness to " 'temporarily set aside' " these personal opinions, and fairly consider either the death penalty or life in prison without parole. (*Leon*, at p. 592.) Here, each juror not only affirmed that he or she was capable of conscientiously considering the sentencing alternatives on their written questionnaires, but also indicated during voir dire that he or she would not automatically vote for or against death regardless of the evidence, and that he or she was capable of imposing either sentence. Moreover, to the extent these jurors' responses might be considered ambiguous or conflicting, we defer to the observations of the trial court, as it was best positioned to evaluate the jurors' responses, attitudes, and

42

demeanors.  (*Leon*, at p. 593; *Jenkins*, at p. 987.)  Defendant's claims would fail on the merits, even if he had not forfeited them.

### 2.  *Exclusion of Defendant's Liberty Defense*

Defendant argues that the trial court deprived him of his constitutional right to testify in his own defense by excluding defendant's liberty defense.  For the reasons discussed below, defendant's argument fails.

### a.  *Background*

The trial court granted defendant's motion for self-representation on December 8, 2003.  Defendant first indicated at a pretrial hearing on May 10, 2004, that he intended on testifying at trial.  After some discussion with the trial court about whether defendant would be allowed to testify in narrative form, ask himself questions, or have advisory counsel ask him questions, the trial court indicated that it would "entertain whatever request it is that" defendant would make, and give the People an opportunity to be heard.

At a subsequent pretrial hearing on March 17, 2005, the trial court indicated that if defendant intended on providing a defense, the trial court would require defendant to make an offer of proof.  Based on defendant's Internet postings and offer to stipulate to culpability in the acts underlying the offense, the trial court was concerned that defendant planned to argue legally invalid defenses.  The trial court referenced defendant's statements from his Internet postings that "I was a corporation; therefore, I am immune from liability," and "I want to make a political statement protesting police brutality."  Defendant indicated his understanding of the trial court's concerns and offered no other explanation or statement at that particular hearing.

Defendant then submitted two briefs to the trial court, in which he argued that he should be allowed to make an offer of proof in camera and ex parte, and

also outlined his proposed defense theory. The People submitted on defendant's request to have an in camera opportunity to explain his liberty defense to the trial court, and the court held an in camera hearing with defendant and advisory counsel on April 1, 2005. At that hearing, defendant explained that his killing of Officer Mobilio was a "necessary" exercise of his "right to defend liberty." Defendant conceded that his defense theory was not recognized anywhere in the United States. According to defendant, the government's infringement of individual liberties justified his killing of Officer Mobilio, as police officers enforce unjust laws. The court explained that the democratic rule of law required individuals who sought to defend liberty to use the political process or the courts, and that the law could not countenance "[s]hooting a cop on the street" in order to effect political change. The court then concluded that defendant would not be allowed to present a defense to the jury that was "not cognizable in the law" because the court could not instruct on such a defense and that the evidence as to those theories was irrelevant. In response, defendant became "very emotional" and indicated that he would sit in "silent protest during the guilt phase." The court offered to give defendant time to reconsider that decision, and after consulting with advisory counsel, defendant again stated that he would not present a defense during the guilt phase.

### b. Legal Standard

Under the due process guarantees of the Fourteenth Amendment to the United States Constitution, a criminal defendant has the right to testify on his or her own behalf. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1332; *People v. Robles* (1970) 2 Cal.3d 205, 215.) These constitutional due process guarantees include the right to present witnesses and evidence in support of a defense. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302.) As the high court has

44

explained, however, these rights are "subject to reasonable restrictions." (*United States v. Scheffer* (1998) 523 U.S. 303, 308; *Chambers*, at p. 302 [noting that a defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence"].)

"As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People v. Hall* (1986) 41 Cal.3d 826, 834; *Rock v. Arkansas* (1987) 483 U.S. 44, 55 [the right to present "relevant testimony is not without limitation"].) As long as the trial court's restrictions on a defendant's right to testify are not "arbitrary or disproportionate to the purposes they are designed to serve," a court may limit a defendant's testimony pursuant to a rule of evidence if "the interests served by [the] rule justify the limitation imposed on the defendant's constitutional right to testify." (*Rock*, at p. 56.) We review a trial court's ruling to exclude evidence as irrelevant for abuse of discretion. (See *People v. Clark* (2011) 52 Cal.4th 856, 892.)

### c. Analysis

Defendant contends that the trial court's order excluding him from presenting evidence in support of his proffered liberty defense to murder on relevance grounds was arbitrary and disproportionate to the interests the relevance doctrine is designed to serve, thus violating defendant's fundamental constitutional right to testify on his own behalf. On appeal, defendant does not argue that his right to testify was improperly restricted because his liberty defense was legally cognizable as justification for the homicide. Instead he contends that the categories of evidence about which he sought to testify were relevant to the circumstances of the offense and to his motive for committing the offense. But the trial court did not err in restricting defendant's ability to testify that his killing of

45

Officer Mobilio was legitimate because it was in defense of liberties that defendant believed were being infringed by the government. Defendant's proffered evidence, that he did not know Officer Mobilio and had no prior interactions with Officer Mobilio, was not relevant to any element of the charged offense of first degree murder, nor did it have any bearing on defendant's guilt or innocence.

Defendant argues that his motive to defend his liberty was relevant evidence. His theory was that such a motive tended to negate the element of premeditation under CALJIC No. 8.73.1, as it tended to show he acted under a delusion. (CALJIC No. 8.73.1 (2004 ed.) ["A hallucination is a perception that has no objective reality. [¶] If the evidence establishes that the perpetrator of an unlawful killing suffered from a hallucination which contributed as a cause of the homicide, you should consider that evidence solely on the issue of whether the perpetrator killed . . . without deliberation and premeditation."].) This argument fails to persuade. Defendant argued that his killing of Officer Mobilio was justified because he acted in defense of liberty in the same way that American colonists did against British attempts to disarm them. At no point was there any evidence or inference that defendant had hallucinated the historical events of the American Revolution or any other events related to the offense. Rather, defendant analogized his actions to those of American revolutionaries, and argued that his killing of a law enforcement officer was an action against tyranny and therefore justified. This does not fall within the scope of CALJIC No. 8.73.1, and the record does not support the conclusion that defendant's liberty defense was relevant to premeditation.

There was no basis in law for either convicting defendant of a lesser offense or excusing defendant from criminal liability altogether. Allowing defendant to testify about his political opinions regarding the government's infringement on

46

personal liberties, including the right to bear arms, would have confused the jury as to why defendant's beliefs were relevant to the elements of first degree murder and would have misled the jury as to the relevance of defendant's personal beliefs. The court did not abuse its discretion by excluding evidence related to defendant's liberty defense.

### C. Penalty Phase Issues

Defendant raises a variety of challenges to the death penalty statute. As defendant concedes, we have previously considered and rejected each of his claims.

Allowing the jury to consider defendant's age as a sentencing factor is not unconstitutionally vague in violation of the Eighth Amendment to the United States Constitution. (*Tuilaepa v. California* (1994) 512 U.S. 967, 977; *People v. Ray* (1996) 13 Cal.4th 313, 358.) We have also previously rejected claims that California's capital punishment scheme fails to perform the narrowing function mandated under the Eighth Amendment. (*People v. Sakarias* (2000) 22 Cal.4th 596, 632.)

Section 190.3, factor (a), as applied, sufficiently minimizes the risk of arbitrary and capricious action prohibited by the Eighth Amendment. (*People v. Schmeck* (2005) 37 Cal.4th 240, 304-305 (*Schmeck*), abrogated in part on different grounds by *People v. McKinnon* (2011) 52 Cal.4th 610.) A jury need not find that aggravating factors outweigh mitigating factors beyond a reasonable doubt. (*Schmeck*, at p. 304.)

We have previously rejected each of defendant's arguments regarding CALJIC 8.85. We see no reason to reconsider our prior conclusion that CALJIC 8.85 does not violate the Eighth and Fourteenth Amendments by "failing to delete inapplicable sentencing factors, delineate between aggravating and mitigating

47

circumstances, or specify a burden of proof" as to aggravation or the penalty decision, nor by limiting certain mitigating factors by adjectives such as "extreme" or "substantial." (*Schmeck*, *supra*, 37 Cal.4th at p. 305; *People v. Ray*, *supra*, 13 Cal.4th at pp. 358-359.)

Moreover, CALJIC 8.88 is not inconsistent with the principle that the jury may return a verdict of life without parole even if it concludes that the evidence in aggravation outweighs the evidence in mitigation. (*People v. Smith* (2005) 35 Cal.4th 334, 370.)

Nor does California "deny capital defendants equal protection by providing certain procedural protections to noncapital defendants but not to capital defendants." (*People v. Williams* (2013) 58 Cal.4th 197, 295.) And we have previously rejected claims that international laws and treaties render the death penalty unconstitutional as applied in this state. (*Id.* at pp. 295-296.) Defendant cites the International Covenant on Civil and Political Rights, but the United States expressly reserved the right to impose capital punishment under that agreement. (*People v. Brown* (2004) 33 Cal.4th 382, 403-404.) Defendant provides no reason for us to reconsider our prior decisions.

## III. Disposition

The judgment is affirmed.

**CUÉLLAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Mickel

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S133510
**Date Filed:** December 19, 2016

_____

**Court:** Superior
**County:** Tehama
**Judge:** S. William Abel

_____

**Counsel:**

Lawrence A. Gibbs, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Ward A. Campbell and Robert C. Nash, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Lawrence A. Gibbs
P.O. Box 7639
Berkeley, CA  94707
(510) 525-6847

Robert C. Nash
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 323-5809